**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-1731 & 17-1941
_____

THOMAS E. ST. PIERRE,
Appellant in No. 17-1731

v.

RETRIEVAL-MASTERS CREDITORS BUREAU, INC.,
Appellant in No. 17-1941
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Civil Action No. 3-15-cv-02596)
Honorable Freda L. Wolfson, U.S. District Judge
_____

Argued: January 23, 2018

Before: GREENAWAY, JR., KRAUSE, *Circuit Judges*, and
JONES, *District Judge*.[*]

_____

[*] The Honorable John E. Jones III, United States District
Judge for the Middle District of Pennsylvania, sitting by
designation.

(Opinion Filed: August 7, 2018)

Michael J. Quirk, Esq. **[ARGUED]**
Berezofsky Law Group
40 West Evergreen Avenue, Suite 104
Philadelphia, PA 19118-3324

Peter Colonna Romano, Esq.
Berezofsky Law Group
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002

Christopher Markos, Esq.
Williams Cedar
1515 Market Street, Suite 1300
Philadelphia, PA 19102
         *Attorneys for Plaintiff-Appellant Thomas E. St. Pierre*

Joel D. Bertocchi, Esq. **[ARGUED]**
Carlos A. Ortiz, Esq.
Louis J. Manetti, Jr.
David M. Schultz, Esq.
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, IL 60606

Han Sheng Beh, Esq.
Hinshaw & Culbertson
800 Third Avenue, 13th Floor
New York, NY 10022
         *Attorneys for Defendant-Appellee Retrieval-Masters*
         *Creditors Bureau, Inc.*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

In this appeal following the District Court's dismissal of Appellant Thomas E. St. Pierre's class action complaint, we consider a matter of first impression among the Courts of Appeals: whether unpaid highway tolls constitute the type of "debt" that could support a consumer claim under the Fair Debt Collection Practices Act. Because we conclude they do not, we will affirm.

## I. Background[1]

### A. Factual Background

St. Pierre is a New Jersey resident and the registered owner of a car that he sometimes drives on New Jersey highways. On those occasions, he is subject to New Jersey's statutory toll requirements, including that "[n]o vehicle shall be permitted to make use of any highway project or part thereof

_____

[1] As this appeal arises from the grant of a motion to dismiss, we accept as true the factual allegations in St. Pierre's amended class action complaint. *See Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 642 n.1 (2008). St. Pierre's complaint was originally filed in New Jersey state court before the case was removed to the District Court in April 2015.

operated by the New Jersey Turnpike Authority [("Authority")] . . . except upon the payment of such tolls, if any, as may from time to time be prescribed by the Authority," N.J. Stat. Ann. § 27:23-25, and that the owner of the vehicle is liable for the payment of highway tolls even if "such vehicle was used or operated" by someone other than the owner, *id.* § 27:23-34.2(b).

Like many car owners in New Jersey, St. Pierre chose to sign up for New Jersey E-ZPass ("E-ZPass"), an electronic toll payment program that facilitates toll collection. E-ZPass accountholders agree to certain terms and conditions (the "E-ZPass Contract"), including that they maintain a positive balance in a prepaid E-ZPass account from which the toll fare is automatically deducted when they pass through an E-ZPass lane and that their "failure to pay charges posted to [their] [a]ccount, including tolls, may result in additional penalties as provided by law."[2] JA 66. When St. Pierre's E-ZPass account

_____

[2] The New Jersey Administrative Code defines E-ZPass as an "Electronic toll collection system" ("ETC System"), which is an electronic system "employed or utilized by the Authority to register and collect the toll required to be paid for a vehicle entering a toll plaza owned and/or operated by, or upon the behalf of, the Authority." N.J. Admin. Code § 19:9-9.1 (2010). Through E-ZPass, "drivers can establish an account, prepay tolls and attach a small electronic device, called a tag or a transponder, to their vehicles. Tolls are automatically calculated and deducted from the prepaid account as an E-ZPass customer passes through the toll lanes." *FAQ's*, *NJ E-ZPass*, https://www.ezpassnj.com/en/about/faqs.shtml (last visited July 12, 2018). The Administrative Code also authorizes the

4

fell into arrears because he failed to maintain a positive balance, E-ZPass assigned it to Appellee Retrieval-Masters Credit Bureau, Inc. ("RMCB"), a private debt collection agency, which, in turn, sent St. Pierre a collection letter "for outstanding violations owed for toll evasions in the amount of $1,200.75."[3]  JA 70.  At issue in this case, however, is not the letter itself but the envelope in which the letter was sent. Visible through the glassine window of that envelope was not only St. Pierre's name and address, but also a "quick response" code[4] and St. Pierre's account number.

---

Authority to adopt a "form of contract" governing the responsibilities of ETC System subscribers, *see* N.J. Admin. Code § 19:9-9.2(h), which New Jersey E-ZPass has utilized by requiring its subscribers to agree to Terms and Conditions available by way of hyperlinks on its website.  *Terms and Conditions*, *NJ E-ZPass*, https://www.ezpassnj.com/en/about/i_terms.pdf  (last visited July 12, 2018).

[3] St. Pierre's FDCPA claim is based only on this letter, which was sent on June 16, 2014.  RMCB also had sent St. Pierre a collection letter in an envelope disclosing the same information on November 11, 2013, attempting to recover $60.06 that "consisted of allegedly unpaid tolls and additional fees."  Appellant's Br. 4.  However, St. Pierre concedes that the FDCPA's one-year limitations period, 15 U.S.C. § 1692k(d), had expired as to that letter by the time he filed his complaint on March 2, 2015.

[4] Here, a "quick response" code is a code that, "when scanned by a device such as a smart phone, reveal[s] the same information as that displayed through the glassine window, as

St. Pierre's amended class action complaint alleges that the disclosure of these two pieces of information on the envelope violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692a-1692p, which prohibits the use of any "unfair or unconscionable means to collect or attempt to collect any debt," *id.* § 1692f, including "any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails," *id.* § 1692f(8). That prohibition, however, applies only to the collection of a "debt," which the FDCPA defines as an "obligation . . . of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *Id.* § 1692a(5). And there lies the crux of this appeal: Do unpaid highway tolls reflect a consumer's "obligation . . . arising out of a transaction in which the . . . services which are the subject of the transaction are primarily for personal, family, or household purposes," *id.*, or a legal obligation in the nature of a tax that falls outside the scope of the FDCPA?

The District Court concluded the latter. Although it held as a threshold matter that St. Pierre had alleged an injury sufficiently "concrete" to confer Article III standing and, by extension, federal jurisdiction, *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, No. 15-cv-2596, 2017 WL 1102635, at *6 (D.N.J. Mar. 24, 2017), it dismissed St. Pierre's complaint on the ground that unpaid highway tolls do not constitute

well as a monetary amount corresponding to [a debtor's] alleged debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 301 (3d Cir. 2014).

6

"debt" and therefore failed to state a claim for a violation of the FDCPA, *id.* at \*10.

St. Pierre filed this appeal challenging the District Court's characterization of the obligation to pay highway tolls, and RMCB cross-appealed, challenging the Court's ruling on standing.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We review de novo both the District Court's decision to dismiss for failure to state a claim, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017), and its conclusion as to standing, *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013).

## III.    Discussion

Because St. Pierre's standing to bring this case implicates the Court's jurisdiction, it must be resolved as a threshold matter.  *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 269 (3d Cir. 2016).  We therefore will address RMCB's cross-appeal before turning to the merits of St. Pierre's FDCPA claim.[5]

---

[5] St. Pierre also cross-appealed, asserting that RMCB lacks standing to challenge this Court's jurisdiction.  We need not tarry over that argument, for "[e]ven if the parties have not raised the issue" of standing, this Court would "examine its authority *sua sponte* during its review of the case." *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 395-96 (3d Cir.

## A.    Standing

To establish standing, St. Pierre must allege facts demonstrating that he suffered (1) an injury-in-fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992). RMBC argues that St. Pierre failed to make that showing because he alleged only a *de minimis* procedural violation of the FDCPA and not an injury-in-fact. Although we previously held in *Douglass v. Convergent Outsourcing*, 765 F.3d 299 (3d Cir. 2014), that a debt collector's disclosure of a debtor's account number through a glassine window is not a *de minimis* violation, RMCB contends the Supreme Court's interim decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), casts doubt on that holding and requires denial of St. Pierre's argument on standing grounds. It does not.

In *Spokeo*, the Supreme Court provided a lens through which to determine whether an intangible injury is sufficiently "concrete and particularized" and "actual or imminent" to qualify as an injury-in-fact. 136 S. Ct. at 1548. We first ask "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American Courts." *Id.* at 1549. If so, it is likely to satisfy the injury-in-fact element of standing; if not, we next ask whether Congress has expressed an intent to make an injury redressable by "elevat[ing] [it] to the status of [a] legally cognizable injur[y]" even if that injury was previously inadequate in law. *Id.* Here too, if Congress

---

2004); *see Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 360 n.9 (3d Cir. 2013).

8

expressed such an intent, the injury is likely to satisfy Article III. Thus, while "a bare procedural violation, divorced from any concrete harm" will not suffice, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id*.

As we recently observed in *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625 (3d Cir. 2017), however, *Spokeo* merely "reiterate[d] traditional notions of standing" and "reemphasize[d] that Congress has the power to define injuries that were previously inadequate at law," rather than "erect[ing] any new barriers that might prevent Congress from identifying new causes of action though they may be based on intangible harms." *Id.* at 638 (internal quotation marks omitted). For that reason, we concluded in *Horizon* that "the improper disclosure of one's personal data in violation of [the Fair Credit Reporting Act] is a cognizable injury for Article III standing purposes," *id.* at 641, and that "the unauthorized dissemination of personal information . . . causes an injury in and of itself—whether or not the disclosure of that information increased the risk of identity theft or some other future harm," *id.* at 639. We also cited approvingly to our prior precedent—*In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125 (3d Cir. 2015), where we held that claims "that the defendants, in the course of serving advertisements to their *personal* web browsers, implanted tracking cookies on their *personal* computers" alleged "concrete, particularized, and actual" injuries, *id.* at 134-35, and *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2016), where we concluded that "the unlawful disclosure of legally protected information" constitutes "a

clear *de facto* injury," *id*. at 272-74—identifying those as other examples of intangible but concrete injuries that Congress had defined to protect consumers. *Horizon*, 846 F.3d at 636-39; *id.* at 642-43 (Shwartz, J., concurring).

*Spokeo* thus reinforces, rather than undermines, our holding in *Douglass.* And that holding squarely resolves the standing issue here. In *Douglass*, we observed that the exposure of a plaintiff's account number through a glassine window[6] "implicates a core concern animating the FDCPA— the invasion of privacy"—and thus is closely related to harm that has traditionally been regarded as providing a basis for a lawsuit in English and American courts. *Douglass*, 765 F.3d at 303; *see Spokeo*, 136 S. Ct. at 1549. We also explained that even if § 1692f(8) contains a "benign language exception," the exposure of a debtor's account number through a glassine window "is not benign" because "we cannot find language exempt from § 1692f(8) if its disclosure on an envelope would run counter to the very reasons Congress enacted the FDCPA." *Douglass*, 765 F.3d at 303.

As *Douglass* controls here, the District Court properly concluded that a violation of § 1692f(8) is a legally cognizable injury that confers standing on St. Pierre.

---

[6] Here, as in *Douglass*, we need not reach the question whether exposure of the "quick response" code on the envelope, without more, would be sufficient to confer standing under the FDCPA because exposure of one's account number itself suffices. *See Douglass*, 765 F.3d at 301 n.4.

### B.     Merits

Having satisfied ourselves of our jurisdiction, we turn to the substance of St. Pierre's claim under the FDCPA.  The FDCPA, which is a remedial statute passed by Congress in 1977 and geared towards eliminating abusive practices by debt collectors, creates a private right of action against debt collectors who violate its provisions.  15 U.S.C. § 1692k; *see also Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006).  "To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt."  *Douglass*, 765 F.3d at 303.

Here, the only disputed prong is the "threshold requirement" that the prohibited collection practices relate to a "debt," *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1167 (3d Cir. 1987), which the FDCPA defines as "any obligation . . . of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes," 15 U.S.C. § 1692a(5).  As the terms "transaction" and "personal, family, or household purposes" are not further defined in the statute, the definition of "debt" has proven elusive.[7]  In an effort to pin

---

[7] *See, e.g.*, *Rosenzweig v. Transworld Sys. Inc*, No. 16-227, 2017 WL 3025557, at *6 (D.N.J. July 14, 2017) (agreeing with the reasoning of the District Court here and concluding that highway tolls are not "debt" because "tolls are akin to taxes for using the particular route"); *Yazo v. Law Enf't Sys.,*

11

it down as to highway tolls, we review the few cases to date in which we have marked its bounds.

### 1. Relevant Precedent Concerning FDCPA "Debt"

We have addressed the definition of FDCPA "debt" in only four cases. In *Staub v. Harris*, 626 F.2d 275 (3d Cir. 1980), we held that a delinquent per capita tax levied by a Pennsylvania taxing district against the plaintiffs was not "debt" encompassed by the FDCPA. *Id.* at 278. Without deciding whether the term "'transaction' as used in the FDCPA always connotes the existence of an underlying contractual relationship," we concluded that, "at a minimum, the statute contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value." *Id.* By contrast, "[t]he relationship between taxpayer and taxing authority," we held, "does not encompass that type of pro tanto exchange which the statutory definition envisages" because tax revenue is a "public burden[] imposed generally upon the inhabitants" used for "nonpersonal purposes [such] as prisons, roads, defense, courts and other governmental services," and "without reference to peculiar benefits to particular individuals[.]" *Id.* (quoting *Black's Law Dictionary* 1307 (5th ed. 1979)).

---

*Inc.*, No. 08-cv-3512, 2008 WL 4852965, at *3 (C.D. Cal. Nov. 7, 2008) (reasoning that because failure to pay highway tolls violates California law, the court "cannot conclude that the obligation to pay arose out of a consensual consumer transaction").

12

Next, in *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3d Cir. 1987), we held that the obligation that arose out of allegedly abusive collection letters sent by defendant cable television companies attempting to collect a sum of money to settle potential tort claims against plaintiffs for the "illegal reception of HBO signals" was not "debt" under the FDCPA because the source of the obligation was an "asserted tort liability" rather than a consensual transaction. *Id*. at 1165-68. While we recognized that "the concept of a 'transaction' is broader than that of a contract . . . nothing in the statute or the legislative history leads us to believe that Congress intended to equate asserted tort liability with asserted consumer debt" or, for that matter, that the FDCPA was intended to protect against "abusive practices in collecting tort settlements from alleged tortfeasors through threats of legal action." *Id.* at 1168.

Over a decade later, in *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000), we addressed whether homeowners' obligations to pay their property taxes, as well as their water and sewer utilities, qualified as "debt" under the statute.[8] *Id.* at 401. As for the property taxes, we held that

---

[8] As we explain in *Tepper v. Amos Fin., LLC*, No. 17-2851, --- F.3d ---- (3d Cir. Aug. 7, 2018), issued contemporaneously with this opinion, another aspect of *Pollice*—that is, our conclusion that the assignee of an obligation is a "debt collector" under 15 U.S.C. § 1692a(6) if the obligation is in default at the time of the assignment, 225 F.3d at 403—was recently abrogated by the Supreme Court in *Henson v. Santander Consumer USA Inc., LLC*, 137 S. Ct. 1718, 1721 (2017). *Henson*, however, did not address the meaning of "debt" under § 1692a(5) and that aspect of *Pollice* remains valid and instructive for our purposes here.

13

"*Staub* [wa]s controlling" because "[u]nlike a sales tax, for example, which arguably arises from the sale transaction, the property taxes . . . arose not from the purchase of property but from the *fact of ownership*." *Id.* at 401-02. We rejected the plaintiff's attempt to distinguish *Staub* on the basis that "the tax obligations changed in character and became 'debts'" when they were assigned to a private entity that was in the business of purchasing such claims, explaining that even after that assignment, "there still had not been a 'transaction' involving the homeowners; their obligation to pay [the private entity] still arose from the levying of taxes." *Id.* at 402. We also concluded that the fact that the homeowners could pay their delinquent property taxes pursuant to a payment plan did not distinguish the nature of the property taxes from the per capita tax in *Staub*. *Id.* at 403. In that context, we explained, the payment plan itself was not the obligation but rather was "simply [] one aspect of defendants' course of conduct in attempting to collect the *original* . . . obligations which were owed to the government entities[.]" *Id.* at 402-03.

We had a different view, however, of the homeowners' water and sewer utility obligations. Those obligations, we held, did constitute FDCPA "debt" because "[a]t the time [they] first arose, homeowners ('consumers' of water and sewer services) had an 'obligation . . . to pay money' to the government entities which arose out of a 'transaction' (requesting water and sewer services) the subject of which was 'services . . . primarily for personal, family, or household purposes.'" *Id.* at 400. The consumer's affirmative "request," we explained, transformed the relationship between the

14

government and homeowner into a "transaction,"[9] *id.*, and the flow of the water directly into the household for personal consumption by the consumer rendered that transaction "primarily for personal, family, or household purposes," *id.* (quoting 15 U.S.C. § 1692a(5)).

Finally, in *Piper v. Portnoff Law Associates, Ltd.*, 396 F.3d 227 (3d Cir. 2005), we again held that transactions involving utility services gave rise to "debt" because "whenever a homeowner voluntarily elects to avail himself of municipal water/sewer services, in whatever manner, and thereby incurs an obligation to pay for such services, there is the kind of *pro tanto* exchange contemplated by the FDCPA." *Id.* at 233 n.8. We also observed that "[t]he consensual nature of the transaction distinguishe[d] [Pennsylvania water and sewer service] from tax assessments which *Pollice* held to not be debts within the meaning of the FDCPA," emphasizing that the consumer's usage "was metered in the normal fashion and . . . the amount of their obligation to pay was based on the amount of water they chose to use." *Id.*

---

[9] In clarifying that the homeowners' water and sewer obligations constituted "debt" under the FDCPA "even though the government entities did not extend homeowners any right to defer payment of their obligations," *Pollice*, 225 F.3d at 401, we also expressly "disavowed" our dictum in *Zimmerman* where we had stated that "the type of transaction which may give rise to a 'debt' as defined in the FDCPA" is "one involving the offer or extension of credit to a consumer," *id.* (quoting *Zimmerman*, 834 F.2d at 1168) (emphasis omitted).

15

From these cases, we distill a three-part test to evaluate whether an obligation constitutes "debt" under the FDCPA. First, we consider whether the underlying obligation "aris[es] out of a transaction," 15 U.S.C. § 1692a(5)—that is, a consensual exchange involving an affirmative "request," *Pollice*, 225 F.3d at 400, and "the rendition of a service or purchase of property or other item of value," *Staub*, 626 F.2d at 278, such as a contract—or whether, instead, it arises by virtue of a legal status—that is, an involuntary obligation attendant to the fact of having a specific legal status such as that of a property owner, *see Pollice*, 225 F.3d at 401, legal resident, *see Staub*, 626 F.2d at 278, or tortfeasor or other type of offender under criminal or civil law, *see Zimmerman*, 834 F.2d at 1168.[10]

---

[10] The other Courts of Appeals that have considered the meaning of FDCPA "debt" have likewise excluded from coverage those obligations that arise out of a legal status rather than a consensual exchange of goods or services. *See, e.g.*, *Boyd v. J.E. Robert Co.*, 765 F.3d 123, 126 n.4 (2d Cir. 2014) (holding the obligation to pay water and sewer charges in New York City did not constitute "debt" because, unlike the "character" of the water and sewer obligations in *Pollice*, "nothing in the record here suggests that plaintiffs must 'request' water and sewer services in order to be charged by the City. Rather, the charges are levied automatically *in connection with the property ownership*") (emphasis added); *Gulley v. Markoff & Krasny*, 664 F.3d 1073, 1074-75 (7th Cir. 2011) (holding the obligation to pay government-imposed fines is not "debt" under the FDCPA because a "fine is a penalty imposed for breaking the law—not the result of a consensual transaction"); *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371-72 (11th Cir. 1998) (holding the

Second, if we conclude that the obligation arises out of a transaction, we next identify what "money, property, insurance, or services . . . [] are the subject of the transaction," 15 U.S.C. § 1692a(5), *i.e.*, what it is that is being rendered in exchange for the monetary payment. And third, we consider the characteristics of that "money, property, insurance, or services" to ascertain whether they are "primarily for personal, family, or household purposes." *Id.*

## 2. The Obligation to Pay Highway Tolls

Applying this framework to the obligation to pay highway tolls, we conclude it does not satisfy the definition of "debt" under the FDCPA.

<u>Step One: Arising out of a Transaction.</u> At the first step, we consider the two arguments raised by St. Pierre as to why the obligation to pay highway tolls arises out of a "transaction." His first, that the transaction out of which his obligation to pay highway tolls arises is the E-ZPass Contract, is a non-starter. We were clear in *Pollice* that the original source of the obligation—not the subsequent method of collection—determines whether an obligation constitutes "debt" under the FDCPA, 225 F.3d at 402, and, like the payment plan in *Pollice*,

---

obligation of a tortfeasor to pay damages is not "debt" under the FDCPA because it is not a "consensual or contractual arrangement" but rather amounts to a "damage obligation[] thrust upon one as a result of no more than her own negligence"); *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (same); *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997) (same).

17

the contract with E-ZPass is merely "directed toward the collection of the original obligations, not any obligations which may have arisen from [the E-ZPass Contract]," *id.* at 403.

St. Pierre attempts to distinguish *Pollice* by arguing that the E-ZPass Contract imposes a $50 per violation fee even for "inadvertent violations" that are otherwise exempted by statute. Reply Br. 10-11. But this too is a false start. St. Pierre cites to no authority for that reading of the E-ZPass Contract, and the E-ZPass Contract expressly provides that drivers are required to pay penalties only "as required by law," JA 66, and thus appears coextensive with the statutory requirement that "an owner that proves an inadvertent toll violation has occurred shall be required only to pay the toll and shall not incur the administrative fee."[11] N.J. Admin. Code § 19:9-9.2(b).

---

[11]As the District Court observed, we do not foreclose the "possib[ility] that certain obligations, unrelated to tolls and penalties, may arise out of the [E-ZPass Contract]," *St. Pierre*, 2017 WL 1102635, at *10 n.6, and thus amount to independent liabilities that qualify as "debt," *see, e.g.*, *Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 842 (E.D. Va. 2015) (holding that E-ZPass "overcharges" that arose out of the E-ZPass contract itself were "properly understood" as a consensual transaction). Here, while the District Court astutely observed that the E-ZPass monthly membership fee of $1 "could arguably be considered a 'debt' because it was created by the [E-ZPass Contract], and not by operation of law," *St. Pierre*, 2017 WL 1102635, at *10 n.6, St. Pierre does not allege that RMCB attempted to collect the $1 membership fee, and, even if he had, he would be hard pressed to explain how that distinct and *de minimis* obligation could convert the obligation to pay

18

St. Pierre makes more headway with his second argument in support of a "transaction," *i.e.*, that he did not have to drive on the toll roads and voluntarily chose to do so. Here, we find the analogy to the utilities in *Piper* compelling: Just as "a homeowner voluntarily elects to avail himself of municipal water/sewer services . . . and thereby incurs an obligation to pay for such services . . . based on the amount of water [the homeowner] chose to use," 396 F.3d at 233 n.8, so too does St. Pierre, by electing to drive on toll roads (or authorizing another driver to do so in his vehicle), "voluntarily elects to avail himself" of the Authority's highway services in exchange for a per-use fee—a classic *pro tanto* exchange, *id.*

We acknowledge this presents a closer case than *Piper* in two respects. For one, the obligation to pay highway tolls is non-consensual in the sense that it involves a statutory requirement. But that is not dispositive: In *Pollice*, we recognized that water and sewer obligations were "debt," notwithstanding the fact that "a City ordinance . . . provides for a twelve percent annual rate of interest on claims for unpaid sewer charges," 225 F.3d at 386, and we observed in dictum that a sales tax—which is, of course, a statutorily-imposed obligation—might constitute "debt" because, unlike property tax, sales tax "arguably arises from the sale transaction" for goods or services rather than "from the *fact of ownership*," *id.* at 402. In neither discussion did we indicate that the mere codification of an obligation precluded the exchange from constituting a transaction.

---

highway tolls into one that arises out of the E-ZPass Contract, *see Pollice*, 225 F.3d at 402-03.

For another, highway tolls are, in a sense, a "tax for the use of highways," *Safeway Trails, Inc. v. Furman*, 197 A.2d 366, 376 (N.J. 1964), and there is some facial appeal to the argument that highway tolls, like the property taxes in *Pollice*, derive "from the *fact of ownership*," 225 F.3d at 402, because liability is assessed on the registered owner of the vehicle that made use of the "highway," N.J. Stat. Ann. § 27:23-25, even if that vehicle was operated by a different driver, *id.* § 27:23-34.2(b). But in contrast to the property taxes in *Pollice*, or the per capita taxes in *Staub*, the liability imposed on vehicle owners is not merely from the fact of ownership or residency but from the voluntary election to drive the owned vehicle on toll roads. *See Pollice*, 225 F.3d at 401; *Staub*, 626 F.2d at 278. That is, St. Pierre would have no obligation to pay highway tolls had he chosen to use alternative routes or to keep his car parked rather than drive on the Authority's roads; the homeowners in *Pollice* and the residents in *Staub* had no such choice.

In sum, St. Pierre's obligation to pay highway tolls does arise out of a "transaction" within the meaning of the FDCPA, 15 U.S.C. § 1692a(5), but while that gives him some momentum, he cannot cross the finish line for an FDCPA claim unless "the subject of the transaction [is] primarily for personal, family, or household purposes," *id.* We thus turn to the next step of our inquiry.

Step Two: The Subject of the Transaction. Before we can determine whether the subject of a transaction is "primarily for personal, family, or household purposes," *id.*, we must identify the subject of the transaction itself: what is being rendered in exchange for payment? Here is where the proverbial rubber meets the road, for while St. Pierre contends

that what he receives is access to New Jersey highways and bridges, what is "payable from tolls" under the New Jersey statute is the Authority's mandate to "facilitate vehicular traffic and remove the present handicaps and hazards on the congested highways in [New Jersey]," and "to acquire, construct, maintain, improve, manage, repair and operate transportation projects." N.J. Stat. Ann. § 27:23-1. As the New Jersey Supreme Court observed in *City of East Orange v. Palmer*, the Authority's mission is "the construction and operation of a highway, on a self-sustaining toll basis." 245 A.2d 327, 330 (N.J. 1968).

The toll booths dispersed throughout the roads, in other words, are merely the collection point for tolls, and access to the roads or bridges is thus incident to the payment of tolls, not the service rendered in exchange for them. Instead, highway tolls "compensate the state for the cost, maintenance and repair of its highways," *Safeway Trails*, 197 A.2d at 375, and in exchange for those tolls all drivers benefit from "safer, faster, and more convenient travel in and through the State," *id*. at 370.

Step Three: The Primary Purpose of the Subject of the Transaction. Having identified the services rendered in exchange for highway tolls, it is clear that what St. Pierre receives in exchange for the payment of highway tolls is not the private benefit of a "personal, family, or household" service or good but the very public benefit of highway maintenance and repair. 15 U.S.C. § 1692a(5). This stands in stark contrast to the services rendered in *Pollice* and *Piper*, where, as the District Court recognized, "the homeowners consumed the water and sewer services, within the confines of their home, for their personal benefit," *St. Pierre*, 2017 WL 1102635, at

21

*8, or, for that matter, any transaction in which the service rendered in exchange for the consumer's money is personal or individual to the consumer, *see, e.g.*, *Franklin v. Parking Revenue Recovery Servs., Inc*., 832 F.3d 741, 745 (7th Cir. 2016) (holding that the obligation to pay for an *individual* parking space in a government-owned parking lot constitutes FDCPA "debt"). Rather, the public nature of the construction, maintenance, or operations of highways steers the obligation away from a "debt" and towards the tax obligations in *Staub*, which, as we observed there, were not primarily personal because they were "used for more general purposes." 626 F.2d at 278.

Moreover, the fact that highway tolls resemble taxes—while not a sufficient basis on which to conclude they do not arise out of a "transaction" at the first stage of our inquiry—does at this step reinforce the conclusion that the services rendered are not primarily for personal purposes. Like taxes, highway tolls are imposed for public benefit and "without reference to peculiar benefits to particular individuals or property." *Staub*, 626 F.2d at 278 (quoting *Black's Law Dictionary* 1307 (5th ed. 1979)). While one component of the obligation to pay highway tolls is the distance traveled, it is also, like taxes, largely determined categorically by the type and class of vehicle being driven[12] and thus is not simply "metered in the normal fashion . . . based on the amount [used]." *Piper*, 396 F.3d at 233 n.8. And just as the amount paid in taxes does not entitle an individual taxpayer to "better" parks, schools, or government systems, the amount paid in tolls

---

[12] *See New Jersey Turnpike Authority Toll Calculator*, http://www.njta.com/toll-calculator (last visited July 12, 2018).

does not entitle the payor to better maintenance or construction of highways.  Rather, to the extent the services rendered by the Authority benefit an individual like St. Pierre, they do so only "secondarily."  *Staub*, 626 F.2d at 278 (internal quotation marks omitted).

Focusing on access to the roads, St. Pierre contends that the benefit is personal and protests that because "[t]he FDCPA defines covered consumer debt based on the alleged *debtor's*— not a creditor's—purposes," his obligation to pay highway tolls should be considered "debt" because his purpose was to attain access not available to the general public and to serve the personal purpose of getting where he was going.  Appellant's Br. 20-21.  That argument, however, mistakenly conflates two distinct inquiries: whether, subjectively, an individual chooses to enter into the transaction primarily for his own personal purposes, and whether, objectively, the subject of the transaction—that is, "the money, property, insurance, or services" being rendered, 15 U.S.C. § 1692a(5)—is primarily for personal purposes.  While in some cases, the two will be aligned, as in the case of utilities, *e.g.*, *Pollice*, 225 F.3d at 400, they are not where the subject of the transaction is the rendition of services that benefit the public generally.  And here, even accepting that road access could be considered a good or service in exchange for toll payments—and not merely an opportunity for toll collection—the other, far more significant services rendered by the Authority in exchange for highway tolls are the public services that follow from its statutory mandate, funded through tolls, "to acquire, construct, maintain, improve, manage, repair and operate transportation projects." N.J. Stat. Ann. § 27:23-1.  The subject of the transaction, in other words, would still not be "primarily" for personal purposes.

In sum, the FDCPA is not implicated where, as here, the bulk, if not all of the services rendered, are made "without reference to peculiar benefits to particular individuals or property." *Staub*, 626 F.2d at 278 (quoting *Black's Law Dictionary* 1307 (5th ed. 1979)). St. Pierre's toll liability thus does not constitute "an[] obligation . . . primarily for personal, family, or household purposes," and does not qualify as "debt" under the FDCPA. 15 U.S.C. § 1692a(5).

## IV.    Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.