**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2483

_____

JAMIE HUBER, individually and on
behalf of all others similarly situated

v.

SIMON'S AGENCY, INC.,
                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-19-cv-01424)
District Judge: Honorable Anita B. Brody

_____

Argued April 25, 2023

Before:  KRAUSE, BIBAS, and RENDELL, *Circuit Judges.*

(Opinion filed: October 12, 2023)

Yitzchak Zelman [ARGUED]
Ari H. Marcus
Marcus & Zelman
701 Cookman Avenue
Suite 300
Asbury Park, NJ 07712
        *Counsel for Appellee*

David B. Shaver [ARGUED]
Surdyk Dowd & Turner
8163 Old Yankee Street
Suite C
Dayton, OH 45458

*Counsel for Appellant*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge*.

Since it entered the scene in 1989, the informational injury doctrine of Article III standing has generated its share of confusion, and with each new case, its contours have come into sharper focus. In this case, Appellee Jamie Huber and the class of consumers she seeks to represent brought suit under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p, after receiving confusing collection letters from Appellant Simon's Agency, Inc. (SAI). The District Court agreed the letters were "misleading and deceptive" in violation of the Act, certified the class, and granted summary judgment in its favor. App. 41. It also rejected SAI's jurisdictional challenge to the plaintiffs' standing under Article III, holding that while confusion from the letter, without more, would not suffice, Huber had standing under the informational injury doctrine because she suffered a concrete financial consequence as a result of her confusion, and the other class members had standing under "the same theory" because they "inevitably" could be expected to suffer the same harm. App. 48.

We agree with the District Court that Huber has standing, but not under the informational injury doctrine. After the District Court rendered its ruling, we decided *Kelly v. RealPage Inc.*, which clarified that a plaintiff who seeks to establish standing based on an "informational injury" must identify "omitted information to which she has entitlement[.]" 47 F.4th 202, 213 (3d Cir. 2022). Huber did not do so and, therefore, did not suffer an informational injury.

But she does have standing on a different basis—that the financial harm she suffered in reliance on the letter bears a "close relationship" to the harm associated with the tort of fraudulent misrepresentation. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). If the other proposed class members can also make that showing, they, too, will have standing, but confusion

2

alone does not constitute concrete injury, and the present record does not reflect whether any of the class members suffered any consequences beyond confusion.

For these reasons, we will affirm the District Court's determination that SAI's letter violated the FDCPA, 15 U.S.C. § 1692e, and that Huber herself has standing, but we will remand for the District Court to consider the extent to which unnamed class members may have standing to "recover individual damages," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), and the implications of that determination for class certification under Federal Rule of Civil Procedure 23(b)(3).

## I.     Factual and Procedural Background

### A.     Huber's Dealings with SAI

In 2018, Huber visited doctors in the Crozer Health Network (Crozer) on four separate occasions. As a result, she incurred the following debts to Crozer: $178 on February 9, $78 on February 22, $83.50 on March 27, and $178 on May 22. Crozer contracted with SAI—a debt collection agency that specializes in medical billing—to collect outstanding bills from Huber and other patients. Whenever Crozer placed a debt with SAI, SAI sent a form collection letter to the debtor. That letter set out an "Account Summary" that provided the debtor with two figures: in one box, the specific debt SAI sought to collect, entitled "Amount," and in another box, a second figure, entitled "Various Other Acc[oun]ts Total Balance." App. 7. By way of example, the fourth such letter Huber received between May and September of 2018—one for each of her debts to Crozer—appeared as follows:

3



| Account Summary | | |
|---|---|---|
| Original Creditor CROZER (CERNER) | | |
| File # 1963792 | Amount $178.00 | Various Other Accts Total Balance $517.50 |

Thus, the "Account Summary" informed Huber that she owed an "Amount" of $178, while her "Various Other Accounts Total Balance" was listed at $517.50. *Id.*

According to her deposition testimony, Huber was confused after reading the letter as to how much she owed in total: Was it $695.50 (the sum of the "Amount" and "Various Other Accounts Total Balance") or $517.50 (just the "Various Other Accounts Total Balance")? Uncertain which amount was due, she paid neither. Instead, she sent the letter to a financial advisor she had retained to help her "take care of [her] financial situation." App. 111.

## B.     The Proceedings Below

Huber filed this putative class action against SAI in 2019 alleging, among other things, that the fourth collection letter constituted a "false, deceptive, or misleading" means of collecting a debt in violation of 15 U.S.C. § 1692e. Huber also alleged that SAI's letter failed to disclose the "amount of the debt" as required by 15 U.S.C. § 1692g(a)(1). But the District Court remarked that the letter straightforwardly stated that the "Amount" of Huber's fourth debt was $178, so there was no actionable failure to disclose. Accordingly, the Court granted summary judgment in favor of SAI on Huber's § 1692g(a)(1) claim, and Huber does not challenge that ruling on appeal.

Following discovery, both parties moved for summary judgment on Huber's § 1692e claim, and Huber prevailed. Applying our Court's objective "least sophisticated debtor standard," App. 17, the District Court observed such a debtor could reasonably read SAI's collection letter in two ways: the

4

recipient's total debt could be either the sum of the "Amount" and the "Various Other Accounts Total Balance," or the latter already representing that sum. Because the former reading is inaccurate—the "Various Other Accounts Total Balance" in fact represents the total debt—the District Court ruled that SAI's form letter was indeed deceptive and therefore violated § 1692e as a matter of law.

Claiming that hundreds of other debtors were also subject to this violation, Huber moved to certify a class under Federal Rule of Civil Procedure 23(b)(3). Her proposed class consisted of "all consumers in Clifton Heights, PA (1) who received a [form] Collection letter from the Defendant (2) containing a reference to 'Various Other Accounts[,'] (3) on an obligation owed or allegedly owed to Crozer, (4) during the time period of April 4, 2018 to May 30, 2018." App. 28. The District Court granted that motion, holding the proposed class satisfied the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), and the predominance and superiority requirements of Rule 23(b)(3).

SAI, now facing class-wide liability, moved for reconsideration on the ground that Huber and the unnamed members of her class had not suffered a concrete injury for purposes of Article III standing. The District Court disagreed. Correctly observing that this Court "ha[d] not [yet] issued a precedential opinion on injury-in-fact stemming from the misleading communications of debt collectors," App. 45, the District Court thoughtfully sought to determine what constitutes such an injury in the FDCPA context. It did so under the auspices of the "informational injury doctrine."

Because we had treated improper disclosures of private information as concrete, if intangible, informational injuries in prior FDCPA cases, the District Court inferred that the dissemination of misleading information likewise should be viewed as a species of informational harm—at least where that that misleading information "influences a plaintiff's credit or management of their debt." App. 46. For this intangible harm to be concrete, it recognized, "confusion itself is not enough," App. 47; rather, the plaintiff must have engaged in "consequential action or inaction following receipt of [the] misleading or deceptive collection letter," App. 47. Such

5

action could "lead[] a plaintiff to pay extra money, affect[] a plaintiff's credit, or otherwise alter[] a plaintiff's response to a debt." App. 46 (quoting *Markakos v. Medicredit, Inc.*, 997 F.3d 778, 780 (7th Cir. 2021)).

On that basis, the District Court concluded that Huber had standing because "[s]he was not merely confused or anxious," but also suffered two types of "financial consequences" as a result of her confusion: (1) "seeking assistance from a professional to figure out how to interpret the letter and how to handle her debt"; and (2) being "unable to pay down her debts or otherwise take appropriate action (other than turning to a third party at her own additional cost) because of the misinformation in SAI's letter." App. 47–48. As for the other class members, the District Court extrapolated that they all had standing under "the same theory of harm" because they received the same confusing letter from SAI, and "being provided with misleading or deceptive information about a debt" would "inevitably" prevent each member's "appropriate action to manage their debt." App. 48. The District Court therefore denied SAI's motion for reconsideration.

Ten days later, the parties stipulated to the statutory damages Huber and the class would receive under the FDCPA if the District Court's rulings were upheld on appeal. Huber would receive $1,000 in statutory damages; the unnamed class members would collectively receive $5,000 in statutory damages to be "distributed on a pro rata basis"; and Huber would also receive a $5,000 service award "for her work in representing the class over the past three years."[1] *Id.* at 52–53.

[1] The parties recognized that these damages awards "represent[ed] the maximum amount of statutory damages available" under the FDCPA. App. 52. That is because, "in the case of a class action," the FDCPA permits "each named plaintiff" to recover "damages as the court may allow, but not exceeding $1,000" and "such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." 15 U.S.C. § 1692k(a)(2). Prevailing plaintiffs are also entitled to costs and attorney's fees, so long as they are "reasonable . . . as determined by the court." *Id.* § 1692k(a)(3).

6

The District Court entered the stipulation as a final appealable order, and SAI timely appealed.

## II.    Jurisdiction and Standard of Review

The District Court had putative jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d).  We have jurisdiction under 28 U.S.C. § 1291, which includes our "jurisdiction to determine our own jurisdiction."  *United States v. Kwasnik*, 55 F.4th 212, 215 (3d Cir. 2022).

Our review of an order granting summary judgment "is plenary, meaning we review anew the District Court's summary judgment decision[], applying the same standard it must apply."  *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Our review of class certification orders, on the other hand, is for abuse of discretion, "which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (quotation omitted).  In assessing whether a district court applied the correct legal standard during class certification, we exercise *de novo* review.  *Id.*

Finally, we review denials of motions for reconsideration for abuse of discretion.  *United States ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 193 (3d Cir. 2022).  When a district court's "denial is based on legal issues, we review that determination *de novo*.  However, factual findings are reviewed for clear error."  *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 186 (3d Cir. 2021) (citation omitted).

## III.    Discussion

We begin as "we must begin every case: with the question of jurisdiction."  *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016).  Because a

plaintiff's standing implicates this Court's Article III jurisdiction, we will address that as a "threshold matter," *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 356 (3d Cir. 2018), before turning to the merits of Huber's FDCPA claim and SAI's challenges to her class action.

## A.     Huber's Article III Standing

While we agree with the District Court's determination that Huber herself has Article III standing, we reach that conclusion on different grounds. Below, we address (1) the requirements of standing and the informational injury doctrine; (2) why that doctrine is inapplicable to Huber's case; and (3) why Huber nonetheless has standing under traditional standing principles.

### 1.     The "Informational Injury" Doctrine

To establish standing under Article III, a plaintiff must show that she suffered: "(1) an injury-in-fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992)). The injury-in-fact requirement "preserves the vitality of the adversarial process," *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring in part and concurring in the judgment), by ensuring the plaintiff has "a 'personal stake' in the case," *TransUnion*, 141 S. Ct. at 2203 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Accordingly, her injury must be "concrete," *i.e.*, "real, and not abstract." *Spokeo*, 578 U.S. at 340 (quotations omitted).

In response to the proliferation of information as both an engine of economic activity and fixture of daily life, the Supreme Court acknowledged in two seminal opinions that even the nondisclosure of information can sometimes constitute a "concrete" injury. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 448–49 (1989) (reasoning that the DOJ's denial of information on judicial candidates under consideration by the ABA prevented plaintiffs from "participat[ing] more effectively in the judicial selection process"); *FEC v. Akins*, 524 U.S. 11, 13–14, 21 (1998) (concluding that the FEC's

"political committee" determination effectively exempting the AIPAC from disclosing its membership, contributions, and expenditures imperiled plaintiffs' ability to "evaluate candidates for public office").

In the decades that followed, we had occasion to apply that informational injury doctrine, but we did not expound on its requirements. Last year, however, in *Kelly v. RealPage, Inc.*, we specified the criteria a plaintiff must meet to establish an informational injury: "she [must be] denied information to which she [is] legally entitled [by statute], and . . . the denial [must] cause[] some adverse consequences related to the purpose of the statute." 47 F.4th at 212. Recognizing that the Supreme Court had developed the informational injury doctrine to address the distinctly modern needs of the Information Age, we deemed that doctrine an exception to the usual concreteness requirement that a plaintiff identify a close historical or common-law analogue to her cause of action. *See id.* at 212 n.8 (declining "to import a historical analogue requirement into the standing analysis for informational injury claims").

But exceptions must be limited, lest they swallow the rule. And, as we explained in *Kelly*, there is no more fundamental limitation on the informational injury doctrine than the need for a plaintiff to show "the denial of information . . . to which she has entitlement." *Id.* at 212–13. The Supreme Court made that clear in *TransUnion LLC v. Ramirez*, when a credit reporting agency had mailed plaintiffs credit files omitting certain required information but sent them that information in separate mailings. 141 S. Ct. at 2213. Those plaintiffs had not suffered an informational injury because, the Court explained, they "did not allege that they failed to receive any required information." *Id.* at 2214. In contrast, the plaintiffs in *Kelly* established standing where they had requested a file disclosure from a credit reporting agency pursuant to the Fair Credit Reporting Act, the file produced by the agency omitted information the statute required, and the plaintiffs suffered the kinds of consequences that the disclosure requirements were designed to prevent. *See* 47 F.4th at 214–15.

9

In short, entitlement to the information allegedly withheld is the *sine qua non* of the informational injury doctrine.

### 2. Huber's Injury Does Not Qualify As "Informational Harm"

*Kelly* makes clear why the doctrine is inapplicable to Huber: she has not alleged "the omission of information to which [she] claim[s] entitlement[.]"[2] 47 F.4th at 214. The very reason the District Court granted summary judgment on Huber's § 1692g(a)(1) claim was that Huber had received all the information to which she was entitled. That is, § 1692g(a)(1) required SAI to disclose "the amount of the debt" for the specific service at issue in the letter, and the box labeled "Amount" did so by telling Huber that she owed $178 for her fourth visit to Crozer. App. 6, 16. That conclusion not only had obvious consequences for Huber's § 1692g(a)(1) claim, but also has consequences for her surviving § 1692e claim because it forecloses the informational injury doctrine of Article III standing.[3]

Because she cannot identify a failure to disclose, Huber urges us instead to extend the informational injury doctrine to the failure to disclose *clearly and effectively*. In support of that capacious theory, she cites decisions interpreting the scope of debt collectors' obligations under the FDCPA. But Huber's argument "confuses standing with the merits," *Frank v. Autovest, LLC*, 961 F.3d 1185, 1189 (D.C. Cir. 2020), as those statutory decisions do not answer the constitutional question of when a harm qualifies as an informational injury for purposes of Article III. And constitutional decisions undermine Huber's

---

[2] We therefore need not address whether Huber demonstrated "'adverse effects' that flow from [an] omission, and . . . the requisite nexus to [a] 'concrete interest' Congress intended to protect." *Kelly*, 47 F.4th at 214.

[3] As Huber does not contend that SAI's letter provided inaccurate information, whether a false disclosure amounts to an omission for purposes of the informational injury doctrine is not at issue here. *Cf. Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 971 (9th Cir. 2018).

proposed expansion of the doctrine. In *TransUnion*, for example, the Supreme Court admonished that an informational injury consists in the "fail[ure] to receive [legally] required information," not merely "receiv[ing] it *in the wrong format*." 141 S. Ct. at 2214; *see also Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (reasoning the informational injury doctrine was inapt when plaintiffs were not "denied desired information, but [instead] . . . received unwanted communications that were misleading").

Simply put, unclear disclosures do not equate to outright omissions. Opening the courthouse doors whenever required disclosures could arguably be clearer would vitiate the concrete injury requirement in almost any case involving information. Neither we nor the Supreme Court has suggested that the informational injury doctrine stretches so far, and we reject that proposition today. Because Huber has not alleged that SAI omitted information to which she was entitled, she did not suffer an informational injury.

### 3. Huber Has Standing Under Traditional Standing Principles

The informational injury doctrine, however, is just one path to standing, and an exceptional one at that. So having ruled it out in Huber's case, we must also consider the more traditional path prescribed by the Supreme Court in *TransUnion*: whether an alleged injury "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341).

In that case, the Court considered the standing of a purported class of consumers claiming that TransUnion "failed to 'follow reasonable procedures to assure maximum possible accuracy' of the plaintiffs' credit files" in its possession, in violation of the Fair Credit Reporting Act, by including alerts in the consumers' files that erroneously labeled them as potential terrorists on a government watchlist. *Id.* at 2208 (quoting 15 U.S.C. § 1681e(b)). Because "[e]very class member must have Article III standing in order to recover individual damages," *id.*, the Court considered separately those class members whose credit files had been transmitted to third

11

parties and those whose credit files were maintained by TransUnion but had not been disseminated. *Id.* at 2208–09.

Class members in the first category had standing, the Court concluded, because they "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation." *Id.* Specifically, the Court explained that "the harm from a misleading statement of this kind [*i.e.*, actually disseminated] bears a sufficiently close relationship to the harm from a false and defamatory statement" to satisfy Article III's concrete injury requirement. *Id*. at 2209. In contrast, those whose credit files contained the same misleading statement but were not disseminated lacked standing because the "retention of information lawfully obtained, without further disclosure, traditionally has not provided the basis for a lawsuit in American courts." *Id*. (quotation omitted). Although Congress intended "to assure maximum possible accuracy" of both categories of credit files, 15 U.S.C. § 1681e(b), the mere presence of "misleading information in the internal credit files" did not qualify as a "concrete harm" sufficient to support standing, *TransUnion*, 141 S. Ct. at 2210.

That distinction brought needed clarity to the proper treatment of Article III standing. Before *TransUnion*, courts sometimes conflated the concepts of "statutory" or "prudential" standing with Article III standing by failing to distinguish between "(i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law," *i.e.*, the merits of a plaintiff's claim, with "(ii) a plaintiff's suffering concrete harm because of [a] defendant's violation of federal law," *i.e.*, a particular plaintiff's standing to bring that claim. *Id.* at 2205. *TransUnion* put that confusion to rest, explaining that Congress may create an "injury in law," but for an individual plaintiff to proceed in federal court, Article III requires that she show her own "injury in fact." *See id.* at 2205–06. As the Court explained, allowing "*unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority" to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *Id.* at 2207.

12

But why not allow any plaintiff seeking to serve as private attorney general to enforce the statutory right alongside the Executive Branch?  Because, the Court explained, in contrast to federal agencies empowered to enforce statutory rights, "[p]rivate plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.*  Thus, a private party may sue to enforce a statute only when (1) Congress has authorized a private right of action, *and* (2) the prospective plaintiff has established her own individual standing under Article III, *i.e.*, a "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2206.

When it comes to the FDCPA, Congress authorized general enforcement by the Federal Trade Commission (FTC), which may seek civil penalties for the dissemination of a "false, deceptive, or misleading representation . . . in connection with the collection of any debt."  15 U.S.C. §§ 1692e, 1692l(a); *see also id.* § 57b.  And Congress also provided a private right of action for individual plaintiffs. *Id.* § 1692k.  But as *TransUnion* makes clear, "under Article III, an injury in law is not an injury in fact.  Only those plaintiffs who have been *concretely harmed* by [the] defendant's statutory violation may sue that private defendant over that violation in federal court."  141 S. Ct. at 2205.

Helpfully, in clarifying the need for an injury-in-fact to establish standing, the Court also clarified the nature of that injury.  To establish standing, a plaintiff must show that she suffered an injury for which there exists a sufficiently "close historical or common-law analogue." *Id.* at 2204.  While it is not necessary to find "an exact duplicate in American history and tradition," *id.*, or to show facts that would "give rise to a cause of action under common law," *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 639 (3d Cir. 2017), the *de jure* injury must "'protect essentially the same interests' as 'traditional causes of action,'" *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 324 (3d Cir. 2018) (quoting *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017)).

13

Here, Huber asserts that the receipt of deceptive collection letters meets that test because "the common law has long reflected an interest in avoiding the harms inherent to receiving misleading information." Ans. Br. 34–35 (quoting *Cunningham v. Credit Bureau of Lancaster Cnty., Inc.*, No. 17-cv-5102, 2018 WL 6062351, at \*6 (E.D. Pa. Nov. 20, 2018)). We take this as an oblique reference to the tort of fraudulent misrepresentation and agree it is an apt analogue. Like fraudulent misrepresentation, a § 1692e violation involves deception, and the statutory prohibition on the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, "protect[s] essentially the same interests" as that "traditional cause[] of action," *Long*, 903 F.3d at 324 (quotation omitted).

But to establish standing, *TransUnion* requires more than a statute's analogue in a common-law action; it requires that "*the harm* [the prospective plaintiff suffered as a result of the statutory violation] bears a sufficiently close relationship to *the harm* from [that common-law action]." 141 S. Ct. at 2209 (emphasis added). It was not sufficient in *TransUnion* that Congress sought to protect the "maximum possible accuracy" of all consumer credit files maintained by credit companies; class members who were labeled potential terrorists but whose credit files had not been disseminated to third parties had not suffered any "concrete injury" because "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm," *id*. at 2210. Those whose files were disseminated, on the other hand, had standing because "the harm [they suffered] from a misleading statement of [that] kind bears a sufficiently close relationship to the harm from a false and defamatory statement." *Id.* at 2209. Likewise, in the FDCPA context, it is not sufficient for a debtor's standing that Congress sought to protect all debtors from the receipt of false or misleading information from debt collectors; each plaintiff asserting a § 1692e violation must establish that "the harm [she suffered] from a misleading statement of this kind bears a sufficiently close relationship to the harm from [fraudulent misrepresentation]." *Id.*

Notably, however, the "harm traditionally recognized as providing a basis for [fraudulent misrepresentation] in American courts," *id*. at 2206, is not the mere receipt of a

14

misleading statement, or even confusion, without any further consequence. It is the "physical, monetary, or cognizable intangible harm," *id.*, such as a reputational or emotional harm, *id.* at 2208; *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155–56 (3d Cir. 2022), that may follow from a plaintiff's "*reliance* upon the misrepresentation*,*" Restatement (Second) of Torts § 525 (Am. L. Inst. 1977) (emphasis added); *see also* John C.P. Goldberg et al., *The Place of Reliance in Fraud*, 48 Ariz. L. Rev. 1001, 1012 (2006) ("[U]nless and until a deception occurs—unless and until there is reliance by the victim—the tort of fraud has not been committed."). The "mere risk" that a plaintiff who receives a misleading letter from a debt collector will suffer such a cognizable injury is "too speculative to support Article III standing." *TransUnion*, 141 S. Ct. at 2211–12.

We therefore agree with the District Court that confusion, without more, is not a concrete injury.[4] Instead, to analogize to the tort of fraudulent misrepresentation, a § 1692e claimant must suffer some cognizable harm that flows from that confusion. Namely, she must identify what the District Court aptly described as a "consequential action or inaction following receipt of a misleading or deceptive collection letter[.]" App. 47.[5] Only then will her injury be of the "same character" as the harm from fraudulent misrepresentation,

---

[4] Our sister circuits are in agreement. *See Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 825 (5th Cir. 2022); *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 363 (6th Cir. 2021); *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020); *Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1137 (8th Cir. 2023); *Adams v. Skagit Bonded Collectors, LLC*, 836 F. App'x 544, 547 (9th Cir. 2020); *Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 830 (10th Cir. 2022); *Trichell*, 964 F.3d at 1004.

[5] *Cf. Shields*, 55 F.4th at 830 ("Shields never pleaded reliance. In other words, she did not allege the same kind of harm as required by the tort of fraud." (citation omitted)); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) ("[C]ritically, [the plaintiff] didn't . . . act to her detriment in response to anything in or omitted from the letter.").

15

*Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 890 (3d Cir. 2020) (quotation omitted), for only then will the "interests" protected by her statutory cause of action align with those of her common-law analogue, *Long*, 903 F.3d at 324 (quotation omitted).

Huber has established that detrimental action for the reasons the District Court adeptly summarized. She did not merely suffer from confusion, but from two resulting "financial consequences": one in consulting with her financial advisor, which the District Court found was "at her own additional cost," and the other in her failure to "pay down her debts or otherwise take appropriate action" beyond that consultation.[6] App. 47–48. Those detrimental consequences are sufficiently similar to the kind of harm protected by the tort of fraudulent misrepresentation to establish Huber's standing.[7]

---

[6] Judge Bibas would not read the record and statements at oral argument as enough to show detrimental reliance. He does not read the record as showing that Huber paid an incremental cost to have her financial advisor help her with this letter. Thus, he would find no standing. But because both of his colleagues find standing here, he joins the rest of the opinion of the Court. *Cf. Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 196 (3d Cir. 2015) (Ambro, J., dissenting in part and concurring in part).

[7] Given the District Court's findings, even SAI's counsel conceded Huber had demonstrated detrimental reliance sufficient for individual standing:

> Q: . . . [T]here are other ways you might characterize what happened—like . . . she sent these documents to her credit advisor and she did testify that she paid for his services.
>
> A: I'm not sure if she did or not. I think that was presumed or implied in the record that she had hired Mr. Ramsey, that she had paid him something at some point.
>
> Q: Why isn't that enough? Let's put the concrete financial loss to the side but, just for

\*       \*       \*

In sum, because we had not yet clarified the informational injury doctrine in *Kelly*, the District Court mistakenly believed Huber had standing as a result of an informational injury. Nevertheless, "[w]e may affirm on any basis supported by the record, even if it departs from the District Court's rationale." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019). And here, tracking the common-law analogy to fraudulent misrepresentation, Huber has identified both an allegedly deceptive communication and specific harmful action and inaction she took as a result of that communication. She therefore suffered a concrete injury for Article III purposes, and having "assure[d] ourselves of [Huber's] standing," *DiNaples v. MRS BPO, LLC*, 934 F.3d 275, 279 (3d Cir. 2019), we can turn to the merits of her claim.

## B.       Fair Debt Collection Practices Act

To prevail on an FDCPA claim, a plaintiff must establish that: "(1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *St. Pierre*, 898 F.3d at 358 (quoting *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014)). The first three elements are uncontested here, so the only question for us is whether the District Court correctly determined that SAI's form letter transgresses the FDCPA—specifically, the prohibition on the "use [of] any false, deceptive, or misleading representation or means in

---

reliance, why aren't those actions or omissions sufficient to show reliance?

A: They might be, right? In Ms. Huber, we have evidence of that . . .

Q: Just to be clear, do you concede for her individual case that there is reliance?

A: Based on her testimony, she has said that she relied to her detriment.

Oral Arg. at 21:04–22:29.

17

connection with the collection of any debt." 15 U.S.C. § 1692e.

Like the District Court, we make that assessment applying the "least sophisticated debtor" standard. *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 470 (3d Cir. 2021) (quoting *Jensen v. Pressler & Pressler*, 791 F.3d 413, 418 (3d Cir. 2015)); *see also Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 594 (3d Cir. 2020) (en banc). Under that test, we consider "whether a debt collector's statement in a communication to a debtor would *deceive* or *mislead* the least sophisticated debtor." *Jensen*, 791 F.3d at 420. Because the standard is objective, "the specific plaintiff need not prove that *she* was actually confused or misled, only that the objective least sophisticated debtor would be." *Id.* at 419.

Although the least sophisticated debtor test "protects naïve consumers, it also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354–55 (3d Cir. 2000) (quotation omitted). Accordingly, we have held that a collection letter is deceptive when "it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Moyer*, 991 F.3d at 470 (quoting *Wilson*, 225 F.3d at 354).

Here, the District Court correctly observed that the "Account Summary" in SAI's form letter could be reasonably interpreted in two ways because, without further explanation, it sets out both an "Amount" and "Various Other Accounts Total Balance." App. 7, 17. Thus, a least sophisticated debtor could read the latter as "Various Other Accounts *Total Balance*," meaning the sum total of her outstanding debt, including the "Amount." Alternatively, a least sophisticated debtor could read it as "*Various Other Accounts* Total Balance," meaning she owes that figure in addition to the "Amount." So as SAI itself acknowledges, "[i]n a vacuum, the Letter could reasonably be read to have the two meanings ascribed by the District Court," Opening Br. 30, and "one of [them] is inaccurate," *Moyer*, 991 F.3d at 470 (quotation

18

omitted). That is the very definition of a "deceptive" communication, in violation of § 1692e.

SAI resists that conclusion by arguing that a debtor in Huber's situation would have deduced the meaning of "Various Other Accounts Total Balance" by comparing the fourth letter she received with the three prior collection letters SAI sent her. *See* Opening Br. 31 ("Each correspondence was about a separate account and the 'Total Balance' identified increased each time by the amount owed for that specific amount.").

That argument highlights the open question whether the least sophisticated debtor standard is "purely objective" or instead "look[s] to what an objective debtor in [the plaintiff's] situation . . . would have thought or done," *Jensen*, 791 F.3d at 422 n.4, but it is not a question to answer today. SAI sent those letters to Huber on May 24, June 14, and July 12, 2018— months before it mailed her its fourth collection letter on September 6, 2018, App. 281–84—and in the intervals between the collection letters, a least sophisticated debtor "may have lost the [prior letters] and forgotten the amount of the debt completely," *Fields v. Wilber L. Firm, P.C.*, 383 F.3d 562, 566 (7th Cir. 2004); *see also Lukawski v. Client Servs., Inc.*, No. 3:12-cv-02082, 2013 WL 4647482, at *3 (M.D. Pa. Aug. 29, 2013) ("[A] least sophisticated consumer, gullible, trusting, and naïve . . . cannot be expected to recall . . . a collection letter received six weeks prior to a current communication."). So even if we look beyond the four corners of SAI's letter, we would not expect a least sophisticated debtor in Huber's position to recall the precise figures in the prior letters, much less understand clearly what amount was due.

In short, whether we examine the fourth collection letter from the perspective of a purely objective least sophisticated debtor or a least sophisticated debtor in Huber's position, SAI's letter is "deceptive" for purposes of § 1692e. We therefore affirm the District Court's grant of summary judgment in Huber's favor on that claim.

19

### C.     Class Considerations

Finally, SAI contends that even if Huber could bring an individual claim under the FDCPA, the District Court erred in permitting her suit to proceed on behalf of a class whose members may or may not have individual standing.   We consider SAI's challenges, first, to the justiciability of the class action for the unnamed class members' lack of standing and, second, to Huber's ability to satisfy the requirements of Federal Rule of Civil Procedure 23.

### 1.     Justiciability

According to SAI, Huber failed to establish that the unnamed class members individually have standing because she did not "present any evidence that [they] acted to their detriment after receiving a letter from SAI in the same form as the [challenged] Letter."  Opening Br. 14.  And absent that showing of individual standing, SAI asserts, Huber's suit is nonjusticiable under Article III.  We consider both arguments below.

### i.     The Standing of the Unnamed Class Members

The District Court generalized from Huber's own injury, holding that all unnamed class members also had standing because their receipt of SAI's letter would "inevitably" cause them similar financial harm to Huber.  App. 48.  Our dissenting colleague appears to go further and to believe that no individualized determination of standing is necessary for the class members (or Huber, for that matter) because Congress, in creating a private right of action under the FDCPA, ensured their injuries were "concrete[]."  Dissent at 11.  We cannot agree with either analysis.

We part ways with the District Court because Huber did not present evidence that any class member other than herself suffered a "consequential action or inaction" as a result of receiving SAI's letter.  App. 47.  The District Court correctly observed that Congress "may not simply enact an injury into existence," so regardless of whether the defendant violated the law, the plaintiff must establish that she herself suffered a

concrete harm. App. 44 (quoting *TransUnion*, 141 S. Ct. at 2205). But neither theory of standing can float the entire class. Just as Huber did not suffer an informational injury, neither did these class members, so the informational injury doctrine cannot support their standing. *Kelly*, 47 F.4th at 214. And while the District Court found that Huber had experienced specific "financial consequences" as a result of SAI's letter, App. 47—rendering her injury analogous to the harm associated with fraudulent misrepresentation and thus concrete for purposes of Article III—it could not make such findings as to any other class member because Huber offered no such evidence.

Some class members may not have been confused at all; some may have been confused but nonetheless paid the correct sum; and some may have cleared up their confusion with a glance at their prior notices. It is also true that some, like Huber, may have suffered sufficiently concrete harm, financial or otherwise, to satisfy Article III. But standing cannot be based on speculative injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Thorne*, 980 F.3d at 893 (explaining that standing will not be found when the "alleged harm, even if concrete, is hypothetical or conjectural"). So while the District Court correctly recognized that mere "receipt of a misleading or deceptive collection letter," without some "consequential action or inaction following [that] receipt," would be insufficient to establish informational harm, App. 47, it was too quick to assume that financial harm was an "inevitable consequence[]" for each and every class member, App. 49.

We part ways with our dissenting colleague to the extent she rejects the need for individualized inquiry and asserts that, because SAI's letter violated the FDCPA, any and all recipients of the letter automatically have standing to bring suit. But that position misapprehends the fundamental distinction between "statutory standing" and Article III standing. According to the dissent, a plaintiff has standing to bring a claim based on a cause of action created by Congress whenever Congress has "impose[d] a statutory prohibition and grant[ed] a plaintiff a cause of action to sue over a 'defendant's violation of that statutory prohibition or obligation,'" Dissent at 1–2 (quoting *TransUnion*, 141 S. Ct.

21

at 2204).  Harm is "concrete[]" simply because "Congress has provided a remedy."  *Id.* at 14.  And a plaintiff's standing depends on "harm to the interest that [Congress sought] to be protected, not actual harm to the plaintiff."  *Id.* at 11; *see also id*. at 13 (stating that "what actually happened to Ms. Huber[] . . . and what happened to every plaintiff in the class," is "irrelevant" because there is no requirement that we consider "the actual impact or consequences of the violation on a particular plaintiff").  From these premises, the dissent concludes that here, because Congress wanted "debtors to be protected from misleading information from collection agencies," the receipt of misleading information—in and of itself—effects a concrete injury, without any need for individualized inquiry.  *Id.* at 15.

The Supreme Court has repudiated each of those premises.  In *Spokeo*, the Court expressly "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"  *TransUnion*, 141 S. Ct. at 2205 (quoting *Spokeo*, 578 U.S. at 341).  In *TransUnion*, it explained that Congress's creation of a statutory remedy does not make harm "concrete"; what matters is whether the particular plaintiff has suffered "any physical, monetary, or cognizable intangible harm traditionally recognized" in common law.  *Id.* at 2206; *see id.* (concrete injury is required "[e]ven if Congress affords . . . a cause of action (with statutory damages available) to sue over [a] defendant's legal violation").  It also made clear that actual or imminent injury to the plaintiff herself is the *sine qua non* of standing— requiring that a plaintiff "seek[s] to remedy . . . harm to herself" and not "merely . . . to ensure a defendant's 'compliance with regulatory law.'"  *Id.* (quoting *Spokeo*, 578 U.S. at 345 (Thomas, J., concurring)).

The dissent is therefore mistaken that Congress can create not just the right, but Article III standing to enforce it, simply by legislating an "interest to be protected . . . in not receiving false or misleading information," Dissent at 12, or that Congress's desire to protect that interest—in the absence of any detrimental consequence to the prospective plaintiff— imbues that plaintiff with standing in "the same way as

22

common law sought to protect people from fraudulent misrepresentations," *id.* at 15. It is precisely because Congress "may not . . . us[e] its lawmaking power to transform something that is not remotely harmful into something that is," *TransUnion*, 141 S. Ct. at 2205, that any plaintiff alleging intangible harm must show an actual or imminent injury "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," [8] *id.* at 2204.

In *TransUnion*, the cognizable harm from wrongly identifying the class members as potential terrorists was akin to the harm from defamation. *Id.* at 2208–09. In *Horizon*, the cognizable harm from the unauthorized release of the plaintiffs' sensitive information was akin to the harm from invasion of privacy, *Horizon*, 846 F.3d at 639–40, as was the disclosure of the plaintiff's financial information in *St. Pierre*, 898 F.3d at 357–58, and the intrusion of an unauthorized robocall in *Susinno,* 862 F.3d at 351–52 & n.3.[9] Here,

---

[8] Although we made the broader statement in *Horizon* that Congress "has the power to define injuries . . . that were previously inadequate in law," 846 F.3d at 638, the dissent places more weight on that statement than it can bear, Dissent at 3–4. First, we still assured ourselves in *Horizon* that the injury at issue "ha[d] a close relationship" to "invasion of privacy," which "has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Horizon*, 846 F.3d at 639–40 (quoting *Spokeo*, 578 U.S. at 341). Second, the Supreme Court later clarified in *TransUnion* that a congressionally defined injury lacking a common-law analogue would not suffice for Article III purposes. *TransUnion*, 141 S. Ct. at 2206.

[9] The dissent attaches significance to the fact that we recognized a concrete injury in *Horizon* without requiring that the plaintiffs' stolen data be "actually used to the plaintiffs' detriment." Dissent at 3. But again, this appears to reflect doctrinal confusion—this time between the requirement that an injury be "concrete and particularized" and the requirement that it be "actual or imminent." *Lujan*, 504 U.S. at 560 (quotation omitted). The question of whether the data was already used to plaintiffs' detriment in *Horizon* went to

23

however, the only harm that we can say with certainty was suffered by the unnamed class members is the receipt of misleading information.

Even assuming *arguendo* that the receipt of that information actually confused each and every class member, confusion, without more, is not "harm traditionally recognized as providing a basis for [fraudulent misrepresentation] in American courts." *TransUnion*, 141 S. Ct. at 2206; *see Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 212–13 (3d Cir. 2002); Restatement (Second) of Torts §§ 525, 549. Nor has Huber identified any other tort that would make the mere receipt of misleading information akin to an "intangible harm traditionally recognized" in common law. *TransUnion*, 141 S. Ct. at 2206. The need for individualized inquiry to determine the standing of the unnamed class members thus stems not from our requirement that plaintiffs prove reliance as "an element of a cause of action for fraudulent misrepresentation," Dissent at 8, but from Article III's requirement of a concrete injury to establish standing, *see TransUnion*, 141 S. Ct. at 2204.

ii.    Consequences for Justiciability

That uncertainty, however, does not render the class action itself non-justiciable. To the contrary, we have held that "the 'cases or controversies' requirement is satisfied so long as a class representative has standing, whether in the context of a

imminence, not concreteness, *see* 846 F.3d at 634, 639 n.19 (discussing plaintiffs' alternative argument that, even if they had not yet suffered a concrete injury, the data breach put them at "imminent . . . risk of harm" for identify fraud), and later cases have made the distinction even clearer; *compare Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011) (declining to find that plaintiffs had standing because, while a data breach may have exposed their personal data to misuse by third parties, "[s]uch misuse is only speculative—not imminent"), *with Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 156–57 (3d Cir. 2022) (finding injury "imminent" in the data breach context when a "known," "sophisticated ransomware group" had already demanded ransom and published the named plaintiff's data on the "Dark Web").

24

settlement or litigation class." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015); *see also Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 478 (3d Cir. 2018) (same). And the Supreme Court has remarked that "federal courts lack jurisdiction if no *named* plaintiff has standing." *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (emphasis added).

SAI urges us to depart from *Neale* and *Mielo* based on *TransUnion*'s purported requirement that each unnamed class member have standing for a class action to present a justiciable case or controversy. But SAI misapprehends *TransUnion*, which held only that individual standing was required for a class member to obtain damages. As the Supreme Court explained: "Every class member must have Article III standing in order *to recover individual damages*. 'Article III does not give federal courts the power *to order relief* to any uninjured plaintiff, class action or not.'" 141 S. Ct. at 2208 (emphasis added) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)). The Court also underscored the limited scope of its holding in a footnote, clarifying: "We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class." *Id.* at 2208 n.4 (citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019)).

*TransUnion* suggests that the need for unnamed class members to demonstrate Article III standing depends on the stage of litigation. At the remedial phase, each class member must establish standing to recover individual damages. *See id.* at 2208. By contrast, at certification, the standing of individual class members may inform whether a proposed class satisfies the requirements of Federal Rule of Civil Procedure 23, *see infra*; *see also Neale*, 794 F.3d at 368, but it is not necessary for each member to prove his or her standing for the class action to be justiciable, *TransUnion*, 141 S. Ct. at 2208 n.4.

We therefore abide by *Neale*'s precept that "so long as a named class representative has standing, a class action presents a valid 'case or controversy' under Article III." 794 F.3d at 369. In doing so, we respect *stare decisis* by "assum[ing] that the law is stable unless there is clear precedent to the contrary. And that means that we do not assume that the

Supreme Court has altered the law unless it says so." *Horizon*, 846 F.3d at 638. Our cases since *TransUnion* have similarly hewed to *Neale* and *Mielo*, albeit without explicitly grappling with the Supreme Court's remarks on standing in class actions. *See Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022); *Duncan v. Governor of V.I.*, 48 F.4th 195, 203 (3d Cir. 2022); *Clemens*, 48 F.4th at 153 n.4.

Because Huber has Article III standing, her proposed class action presents a justiciable case or controversy even though some unnamed class members may lack standing.

### 2. Certification

On the other hand, the possibility that some unnamed class members lack standing may prevent certification under Federal Rule of Civil Procedure 23. While *TransUnion* left open "whether every class member must demonstrate standing *before* a court certifies a class," 141 S. Ct. at 2208 n.4 (citing *Cordoba*, 942 F.3d at 1277), our precedent supplies an answer to that query: We do not "requir[e] Article III standing of absent class members" prior to certification, but the potential inclusion of some members without standing in a class can result in "legitimate Rule 23 challenges." *Neale*, 794 F.3d at 367–68.

SAI raises three certification challenges here, contending Huber's failure to establish unnamed class members' standing means her proposed class cannot satisfy the commonality, typicality, and predominance requirements of Federal Rule of Civil Procedure 23. We address each objection in turn.

The commonality prerequisite to certification derives from Federal Rule of Civil Procedure 23(a)(2)'s insistence that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). According to SAI, Huber's class does not satisfy commonality because Huber has not shown that "she and the class members suffered the same injury." Reply Br. 19 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011)). Here, SAI conflates the common injury the Supreme Court demanded in *Dukes* for purposes of Federal Rule of Civil Procedure 23(a)(2) with the injury-in-fact component of

26

standing. As *Dukes* explained, class members suffer a common injury for Rule 23(a)(2) when their claims "depend upon a common contention . . . capable of classwide resolution." 564 U.S. at 350. Huber's suit raises a common contention as to every class member—namely, that the form collection letter they all received violates 15 U.S.C. § 1692e. *Cf. Dukes*, 564 U.S. at 350 (observing a class would satisfy commonality by asserting, for example, "discriminatory bias on the part of the same supervisor"). The class thus asserts a "common contention" and so shares common questions of law or fact for Rule 23(a)(2) purposes. *Id.*

Next, SAI suggests the class founders on the requirement that Huber's "claims or defenses . . . [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Huber's claim is atypical, according to SAI, because Huber has not submitted evidence of the specific detrimental consequences unnamed class members experienced after receiving the form collection letter. Yet the typicality requirement merely serves to ensure that class representatives do not have "unique interests that might motivate them to litigate against or settle with the defendants in a way that prejudices the absentees," *Duncan*, 48 F.4th at 207 (quotation omitted), and here the merits of Huber's FDCPA claim are identical to those of the unnamed class members',[10] *see Boley*, 36 F.4th at 134 ("[A] violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice."). As a result, Huber's interests are "sufficiently aligned with those of the class" to satisfy typicality. *Id.*

In a last challenge to certification, SAI contends that the individualized questions regarding unnamed class members' standing will overwhelm common questions, such that Huber cannot meet the predominance requirement of Federal Rule of Civil Procedure 23(b)(3) (stating "questions of law or fact

---

[10] Nor is she "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *Duncan*, 48 F.4th at 207 (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009)).

27

common to class members [must] predominate over any questions affecting only individual members").

The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (quoting *Tyson*, 577 U.S. at 453). To answer that question, "court[s] must look first to the elements of the plaintiffs' underlying claims . . . through the prism of Rule 23" to assess whether the class members can prove their claims with "evidence that is common to the class rather than individual to its members." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127–28 (3d Cir. 2018) (quotations omitted). But "the presence of individual questions does not *per se* rule out a finding of predominance." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998). Rather, as the Supreme Court has counseled:

> When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

*Tyson*, 577 U.S. at 453 (quoting 7AA Charles A. Wright et al., *Federal Practice and Procedure* § 1778 (3d ed. 2005)).

No doubt, predominance concerns can arise when unnamed class members must submit individualized evidence to satisfy standing and recover damages. We have previously recognized as much, *see Neale*, 794 F.3d at 368 (explaining that differences between injuries suffered by class members can "affect . . . predominance analyses"), as did the Supreme Court in tacitly endorsing the Eleventh Circuit's decision in *Cordoba*, *see TransUnion*, 141 S. Ct. at 2208 n.4 (citing *Cordoba*, 942 F.3d at 1277). Although the named plaintiff in *Cordoba* had Article III standing, 942 F.3d at 1271, the evidence in the record was inconclusive as to the proportion of unnamed class members who could make a similar showing,

28

*id.* at 1275. To recover damages, the Eleventh Circuit explained, unnamed class members would have to submit individualized evidence of their standing. *Id.* at 1274. Depending on the number of class members able to satisfy that burden and the difficulty of identifying those class members, "individualized determinations might overwhelm issues common the class," *id.* at 1275, so the district court needed "to address whether common issues predominate under Rule 23(b)(3) when this [standing] issue is baked into the analysis," *id.* at 1277. Accordingly, the Eleventh Circuit vacated the class certification order and remanded.

Like the Eleventh Circuit in *Cordoba*, we conclude that remand is necessary here owing to the lack of evidence in the record indicating how many members of Huber's class are likely to have standing and how burdensome that showing will be for both the District Court and the parties. Because the District Court decided that Huber and the unnamed members of her class suffered informational injuries, the Court had no occasion to consider how individualized evidence of unnamed class members' standing would affect the balance of common versus individual issues for purposes of predominance, or what proportion of the class could be expected to establish standing. Thus, the District Court must assess the implications of those individualized showings for the predominance requirement of Federal Rule of Civil Procedure 23(b)(3).[11]  *See Neale*, 794 F.3d at 368.

On remand, Huber should submit evidence enabling the District Court to estimate "how many class members (or what proportion of them)" have standing.[12]  *Cordoba*, 942 F.3d at

[11] Although SAI does not contest Huber's ability to satisfy numerosity under Federal Rule of Civil Procedure 23(a)(1), a plaintiff cannot satisfy that requirement by "resorting to mere speculation." *Mielo*, 897 F.3d at 484. Thus, on remand, the District Court should also consider the implications of unnamed class members' potential lack of standing for the numerosity requirement.

[12] At the certification stage, Huber need not prove the exact number of class members who have standing. Instead, as often is the case in assessments of the Rule 23 criteria, Huber can

29

1275. Additionally, the Court should evaluate the feasibility of receiving individualized evidence on class members' standing. If the Court surmises that few class members will be able to show they undertook the kind of detrimental action or inaction required for standing or that "it will be extraordinarily difficult to identify those who did," *id.* at 1275, then Huber's proposed class is not "sufficiently cohesive to warrant adjudication by representation," *Reinig*, 912 F.3d at 127 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)). By contrast, if many class members appear likely to satisfy standing "or if there is a plausible straightforward method to sort them out at the back end of the case, then the class might appropriately proceed as it is currently defined." *Cordoba*, 942 F.3d at 1275.

We have no doubt that our esteemed colleague on the District Court—given her deep familiarity with this case and vast experience on the bench—is well-equipped to make those determinations. We will therefore vacate the class certification order and remand for the District Court to decide whether Huber's proposed class satisfies Federal Rule of Civil Procedure 23(b)(3) notwithstanding the individualized evidence class members must submit to demonstrate standing and recover damages. In addition, because the District Court's damages award was predicated on its class certification decision, *see* App. 51–52, we will also vacate that order to enable the District Court to reassess damages, if needed to avoid any anomalous windfall. The District Court can then exercise its wide discretion, depending on its determinations as to certification and the number of class members expected to have standing and to recover damages, to ensure appropriate amounts of both statutory damages and attorney's fees. *See* 15 U.S.C. § 1692k(a)(2)–(3).

---

resort to any number of mechanisms to offer a sufficiently reliable estimate of the proportion of class members who will be able to demonstrate standing. *Cf. Reinig*, 912 F.3d at 128 (recognizing "representative evidence [can] satisfy the commonality/predominance requirements of Rule 23"); *Marcus*, 687 F.3d at 596 (explaining a "plaintiff [need not] offer direct evidence of the exact number and identities of the class members").

## IV. <u>Conclusion</u>

For the foregoing reasons, we will affirm the District Court's rulings that Huber has Article III standing and that SAI's form collection letter violated 15 U.S.C. § 1692e. However, we will vacate the District Court's orders certifying Huber's proposed class and awarding damages and will remand for proceedings consistent with this opinion.

**RENDELL**, *Circuit Judge*, concurring in part and dissenting in part

Jamie Huber received misleading notices from a collection agency that, under our case law, were deceptive as a matter of law. The same goes for members of the class certified by the District Court. I agree with the Majority that Huber has standing. But unlike the Majority, I adopt the analysis that comports with our precedent and would affirm outright without any need for a remand to examine the propriety of the class certification. So, I part ways with the Majority and respectfully dissent as to the proper analysis and ultimate disposition.

The Majority's reasoning disregards both controlling Supreme Court precedent in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), and our precedent, namely our opinions in *Susinno v. Work Out World Inc.*, 862 F.3d 346 (3d Cir. 2017) (Hardiman, J.), and *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625 (3d Cir. 2017) (Jordan, J.). The Majority purports to follow *Spokeo* and *TransUnion*, but it fails to emphasize that the issue before us involves the unique question of concreteness for purposes of determining the standing of a plaintiff bringing a claim based on a cause of action created by Congress. Moreover, the Majority conflates standing in such cases with the injury required in other Article III standing cases, focusing on the extent of harm or injury. *Spokeo* and *TransUnion* do not ever refer to an inquiry along these lines. This is a distinct type of standing, as we afford "due respect" to Congress's decision to impose a statutory prohibition and grant a plaintiff a cause of action to sue over a "defendant's

1

violation of that statutory prohibition or obligation." *TransUnion*, 141 S. Ct. at 2204 (citing *Spokeo*, 578 U.S. at 341). This "respect" means that we allow Congress to provide a remedy to plaintiffs in certain situations where they might not have satisfied the traditional notions of harm required at common law. Congress "has the power to define injuries that were previously inadequate in law." *Horizon*, 846 F.3d at 638 (internal quotation marks omitted) (quoting *Spokeo*, 578 U.S. at 341). Otherwise, why create a special test for "concreteness" in these cases?

The analysis in this situation is quite specific and straightforward. We ask whether the claim vindicates a right traditionally recognized at common law (*i.e.*, is there a common law analog?) taking into account Congress's view regarding the need to vindicate that right.[1] We must also make sure that the situation actually implicates the interest to be protected so that a plaintiff is not simply complaining of a "bare procedural violation" of a statute unconnected to any impact on her. *Spokeo*, 578 U.S. at 342. Checking these boxes leads to a plaintiff's satisfying the "concreteness" test for standing to pursue a congressionally created claim based on an alleged intangible harm. "Case closed"—or, actually,

---

[1] This is an abbreviated version of what the Supreme Court outlined in both *Spokeo* and *TransUnion*. *See Spokeo*, 578 U.S. at 340–41; *TransUnion*, 141 S. Ct. at 2204–05. In *Horizon*, Judge Jordan provided a thorough explanation of *Spokeo*'s reasoning, *see* 846 F.3d at 636–39, which Judge Hardiman relied upon in *Susinno*, *see* 862 F.3d at 350–51. A few years later, *TransUnion* expanded further, but it did so consistent with *Spokeo*.

opened—because Huber's claim meets this test, as I discuss more fully below.

We performed this analysis correctly in *Horizon* and in *Susinno*.

In *Horizon*, plaintiffs' laptops containing highly sensitive and private personal information were stolen. 846 F.3d at 630. The complaint alleged that their insurance company, Horizon, failed to maintain the confidentiality of the plaintiffs' information, giving rise to a cause of action under the Fair Credit Reporting Act (FCRA). *Id*. at 629. It did not allege that the false information was actually used to the plaintiffs' detriment. *Id*. The district court had dismissed the case, concluding that "standing requires some form of additional 'specific harm' beyond 'mere violations of statutory and common law rights.'" *Id*. at 634. We reversed based on our own precedent in *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015), and *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262 (3d Cir. 2016), citing the principle that "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private." *Horizon*, 846 F.3d at 636 (quotation marks omitted) (quoting *Google*, 806 F.3d at 274). We noted that *Spokeo* did not compel a different outcome and commented on *Spokeo*'s recognition of Congress's role:

> We reaffirm that conclusion today. *Spokeo* itself does not state that it is redefining the injury-in-fact requirement. Instead, it reemphasizes that Congress "has the power to define injuries that were previously inadequate in

3

law." In the absence of any indication to the contrary, we understand that the *Spokeo* Court meant to reiterate traditional notions of standing, rather than erect any new barriers that might prevent Congress from identifying new causes of action though they may be based on intangible harms.

*Id*. at 638 (internal citations omitted) (quoting *Spokeo*, 578 U.S. at 341). And in *Susinno*, we summarized *Horizon*'s rule as follows:

When one sues under a statute alleging "the very injury [the statute] is intended to prevent," and the injury "has a close relationship to a harm . . . traditionally . . . providing a basis for a lawsuit in English or American courts," a concrete injury has been pleaded.

862 F.3d at 351 (quoting *Horizon*, 846 F.3d at 639–40) (alteration in original). We then proceeded to conclude that the plaintiff in *Susinno* had pled a concrete, albeit intangible, injury by complaining of one prerecorded call and voice message to her cellular telephone that violated the Telephone Consumer Protection Act (TCPA):

Where a plaintiff's intangible injury has been made legally cognizable through the democratic process, and the injury closely

4

relates to a cause of action traditionally recognized in English and American courts, standing to sue exists.

*Id*. at 352.

After we decided *Horizon* and *Susinno*, the Supreme Court revisited, and reiterated, the appropriate test in *TransUnion*. There, the plaintiffs complained of "misleading" alerts in their credit reports that indicated each of the plaintiffs was a "potential match to names on the OFAC list [of suspected terrorists]." *TransUnion*, 141 S. Ct. at 2202. This was based on the credit reporting agencies' matching first and last names against the list. The Supreme Court once again laid out the test for "concreteness" of an intangible harm, explaining that the harm experienced by "the 1,853 class members whose reports [containing potentially misleading information] were disseminated to third parties suffered a concrete injury in fact under Article III" because "the harm from a misleading statement . . . bears a *sufficiently close relationship* to the harm from a false and defamatory statement." *Id.* at 2209 (emphasis added). End of analysis. As the Majority points out, the other class of plaintiffs in *TransUnion*, whose reports were not disseminated, did not suffer a concrete injury because there was "no historical or common law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *TransUnion*, 141 S. Ct. at 2209 (quoting *Owner-Operator Indep. Drivers, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 344–45 (D.C. Cir. 2018)) (quotation marks omitted). The Majority states that the distinction between the plaintiffs whose misleading reports were sent and plaintiffs whose misleading reports were not "brought needed clarity to the

5

proper treatment of Article III standing." Maj. Op., Section III.A.3, *supra*. It then expands on the need for a "personal stake." I agree. Here, if the misleading notice had never been sent to *Huber*, she would have no claim. Or, if, as the Majority's quotation from *TransUnion* notes, Huber had no personal stake because she was only pursuing a mere procedural violation with no connection to her she would lack standing.[2] But no one has contended that Huber lacks a personal stake or is pursuing a mere procedural violation.[3]

---

[2] Indeed, to make this point, the Supreme Court considered a hypothetical Hawaii resident complaining of a factory's environmental pollution of a Maine resident's land—in such a situation, the Hawaii resident would have no standing to sue the factory. *TransUnion*, 141 S. Ct. at 2205–06.

[3] The Majority returns later in its opinion to *TransUnion*'s distinction between the "sent" report and "non-sent" report plaintiffs as if it supports its argument regarding the need for harmful consequences, but it really has no bearing on that issue. Maj. Op., Section III.A.3, *supra*. Indeed, the quotations it uses from *TransUnion* that purportedly support its position regarding the need for consequences (*i.e.*, its assertion that the "mere receipt" of a misleading communication is not enough and its statement that the mere risk that a plaintiff who receives a misleading letter from a debt collector will suffer such a cognizable injury is "too speculative to support Article III standing") are from *TransUnion*'s rejection of the argument that the non-sent report plaintiffs should have standing because there is a risk that the reports might be sent. That is the "speculation" it is discussing. As Justice Kagan recently advised, "when you see that my description of precedent differs from the majority's go take a look at the decision. . . . I'll take my chances on readers' good judgment." *Andy*

6

The Majority quotes *TransUnion* regarding the need to find a "sufficiently close relationship" between a statutory harm and a common law harm, but it fails to heed the Supreme Court's essential conclusion: once a close relationship is found with a common law analog, the plaintiff has standing because the injury is concrete as a matter of law. Rather than reasoning along these lines and asking, "does the harm from a misleading communication from a collection agency have a sufficiently close relationship to the harm from a fraudulent misrepresentation?" (the answer is, yes), the Majority focuses on "consequences" flowing from the receipt of a misleading communication and asserts that there is no match, or "close relationship," because to state a claim for fraudulent misrepresentation the plaintiff must have detrimentally relied on the communication, *i.e.*, there must be some "further consequence." Maj. Op. Section III.A.3., *supra*. To analogize to the tort of fraudulent misrepresentation, the Majority concludes, a § 1692e claimant must suffer some cognizable harm that flows from the confusion that attends her receipt of the misleading communication.

But in *TransUnion*, the Court noted that "[i]n looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate." *Id*. Bearing that principle in mind, the Court concluded that saying someone was a "potential terrorist" was "sufficiently close" to saying that he is an actual terrorist so as to be analogized to defamation. *Id*. In truth, the statement was more misleading than defamatory. If the Supreme Court had

*Warhol Found. for Visual Arts, Inc. v. Goldsmith*, No. 21-869, 598 U.S. \_\_\_\_, \_\_\_\_ (slip op. at 4, n.2) (2023) (Kagan, J., dissenting).

7

wanted the relationship to defamation to be something more than "sufficiently close," the analogy may not have worked because truth might have been a defense. Indeed, based on the matching of the names, the "potential match" was true (*i.e.*, the name "Susan Smith" appeared on the OFAC list). Moreover, a match may have been true for some plaintiffs (*i.e.*, if the "Susan Smith" identified by the credit report was, in fact, the same "Susan Smith" identified on the OFAC list). So, the element of falsity normally associated with defamation was tenuous at best. That did not concern the Court: an exact match to the common law cause of action is not required.

The Majority here appears to heed our, and the Supreme Court's, directives by analogizing Huber's situation to the common law tort of fraudulent misrepresentation:

> Huber asserts that the receipt of deceptive collection letters meets that test, because the common law has long reflected an interest in avoiding the harms inherent to receiving misleading information. We take this as an oblique reference to the tort of fraudulent misrepresentation and agree it is an apt analogue. Like fraudulent misrepresentation, a § 1692e violation involves deception[,] and the statutory prohibition on the use of any false, deceptive, or misleading representation or means in connection with the collection of any debt protects

8

> essentially the same interests as
> that traditional cause of action.

Maj. Op., Section III.A.3, *supra* (cleaned up and bracketed alteration added). The Majority should have ended its reasoning there and concluded with a statement similar to the one that the Supreme Court made in *TransUnion*: "In short, a plaintiff who received a misleading statement regarding the amount of the debt she owes suffered a concrete injury in fact under Article III." Instead, the Majority considers two unnecessary issues: first, whether there has been some "consequential action or inaction following receipt of [the] misleading or deceptive collection letter," Maj. Op., Section III.A.3, *i.e.*, did the plaintiffs detrimentally rely on the misleading information? And second, what was the extent of the harm caused by the detrimental reliance?

As to the first inquiry, action in reliance on the misrepresentation is an element of a cause of action for fraudulent misrepresentation. But in discussing the common law analog in *Horizon*, we specifically rejected any notion that a plaintiff's allegations need to state a cause of action:

> We are not suggesting that Horizon's actions would give rise to a cause of action under common law. No common law tort proscribes the release of truthful information that is not harmful to one's reputation or otherwise offensive.

*Horizon*, 846 F.3d at 639. Although the Majority quotes this language from *Horizon*, it proceeds to disregard it by focusing its attention on the proposition that "until a deception occurs—

9

unless and until there is reliance by the victim—the tort of fraud has not been committed." Maj. Op., Section III.A.3, *supra*. In *Horizon*, the personal information that was on the stolen computers was not false, so there really was no cause of action at common law for the employers' failure to safeguard the plaintiffs' personal information. But we reasoned that the 'intangible harm' that the FCRA seeks to remedy had a sufficiently close relationship to a harm—invasion of privacy—that has traditionally been regarded as providing a basis for a lawsuit in English and American courts. It was a stretch to say that the insurer, by being negligent in keeping the information sufficiently secure, had invaded its members' privacy. No matter; the harm was close enough based on the interest to be protected. And in *Susinno*, we reiterated that the focus should be on the interest to be protected:

> [A] close relationship does not require that the newly proscribed conduct would "give rise to a cause of action under common law." But it does require that newly established causes of action protect *essentially the same interests that traditional causes of action sought to protect*.

*Susinno*, 862 F.3d at 351 (internal citation omitted) (emphasis added). To be clear, the historical analysis in *Susinno* centered on the link between the common law analog and the statutory cause of action itself—not any specific theory of liability under the statute. The plaintiff's allegation of receiving a single unwanted robocall amounted to an unadorned, garden-variety TCPA claim. We still concluded that the mere violation of the TCPA provision at issue worked a sufficiently concrete injury

10

for Article III standing. So, our precedent leaves no room to ask for more than that in this case.

In *TransUnion*, the Court analogized the asserted harm to the harm of defamation looking only at the dissemination of misleading information, and it respected Congress's decision to protect an individual's interest in not having misleading information disseminated by credit reporting agencies. While the Majority says there must be "reputational or emotional harm," Maj. Op., Section III.A.3., the Court in *TransUnion* did not concern itself with whether the information was false, or whether anyone receiving the report actually read it or denied credit to the plaintiffs, or whether there was harm to plaintiffs' reputations—all relevant considerations in a defamation case. Rather, the Court was concerned with the interest at stake, not with mirroring the cause of action.

By adding a requirement of consequences resulting from reliance, the Majority drastically limits the remedy Congress provided, undermining Congressional policy and the separation of powers. As we noted in *Sussino*, this is a matter for the democratic process. Furthermore, not only is the imposition of this reliance element contrary to precedent, but the error of imposing this element is compounded by the Majority's holding that the predominance inquiry of the class action certification analysis cannot be conducted unless and until the District Court inquires into whether each class member did or did not detrimentally rely on the defendant's misleading collection letter, and the extent of harm. This is not only analytically incorrect, but it also dooms all class actions

11

under § 1692e of the FCRA.[4]  This undermines the statutory scheme.

Once the relationship to common law is found, there is no place for further inquiry, let alone any inquiry into the extent of the harm.  This is the Majority's second error.  The Majority insists upon "further consequences" that follow from the detrimental reliance and opines that "confusion, without more, is not a concrete injury."  Maj. Op., Section III.A.3, *supra*.

---

[4] Moreover, I am not sure as a practical matter what such an inquiry will "look like."  The Majority states only that, on remand, Huber should submit evidence that would allow the District Court to estimate how many class members have standing, yet it also suggests that the District Court could potentially find that receiving individualized evidence on class members' standing is not feasible. Maj. Op. Section III.C.2, *supra*. Beyond that guidance, what is the District Court to do on remand?  Are the class members to be asked if they detrimentally relied on the misleading notice?  What does "detrimentally relied on" mean?  Are the negative consequences here really "detrimental reliance" or just obvious consequences?  What would a class member need to have done to satisfy this requirement?  What if they lost sleep?  Or suffered from anxiety?  Why does it matter?  The harm that Congress sought to prevent was the harm experienced by the receipt of misleading information by debtors.  If the information is misleading as a matter of law—as this was—presumably the debtor was deceived.  That is the same harm that an action for fraudulent misrepresentation was aimed at, at common law.  That is all we need to know for purposes of standing.  Why do we need to know what the debtor did after receiving the misleading letter?  What if they did nothing because they did not know what to do?  It matters not.

12

However, as I have explained, as long as an analog is identified, plaintiffs have "suffered a concrete injury in fact under Article III," whether or not plaintiff is subjectively confused. *TransUnion*, 141 S. Ct. at 2209. Confusion is a red herring.[5] When we speak of harm in this context, we speak of the harm envisioned by Congress, *i.e.*, "a harm . . . traditionally . . . providing a basis for a lawsuit in English or American courts." *Sussino*, 862 F.3d at 351 (quoting *Horizon*, 846 F.3d at 639–40). It is the harm to the interest that is to be protected, not actual harm to the plaintiff. Otherwise, why would the Supreme Court and we not have considered actual harm in the precedents we rely on? The Majority's focus on finding a tangible harm, and determining the extent of this harm and injury—a sort of "analog plus" analysis—is misplaced.

The Majority seems to reject the notion that an intangible harm can be concrete but that is what *TransUnion* is all about. *TransUnion*, 141 S. Ct. at 2204 ("Various intangible harms can also be concrete."). The intangible harms at the core of all of the statutory causes of action we have been describing confer standing without proof of tangible injury. *See id.* (gathering examples). So, the Majority's "analog plus" analysis, which insists upon proof of tangible harm is at odds with the precedents that are our guide.

---

[5] The District Court also seemed confused by the issue of confusion, but it ultimately reasoned more along the lines of the inevitable nature of harm here: "In matters of debt collection, informational harm leads to financial harm." *Huber v. Simon's Agency, Inc.*, Civ. A. No. 2:19-01424, 2022 WL 1801497, at *4 (E.D. Pa. June 2, 2022). This is the judgment that Congress made, and we need not inquire further.

13

Instead, we should look at the interest that Congress sought to protect and ask whether there is similarity between that interest and the interest that common law sought to protect.

So, too, here, the interest to be protected is the interest in not receiving false or misleading information, and the harm of a misleading communication from a collection agency to a debtor regarding the amount that is owed has a *close relationship* to the harm caused by a fraudulent misrepresentation at common law.[6] As I noted above, the Majority says so itself.

---

[6] Our analysis in *Susinno* also confirms that statutory causes of action can have multiple analogs and that a plaintiff has standing as long as the court can identify one that fits—whether or not the plaintiff does so. Thus, even though we thought intrusion upon seclusion was the *best* analog, we agreed with the Ninth Circuit "that TCPA claims closely relate to [other] traditional claims for 'invasions of privacy . . . and nuisance [which] have long been heard by American courts.'" *Susinno*, 862 F.3d at 351 (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)) (second alteration in original). Likewise, colleagues on our sister courts have suggested that torts other than fraudulent misrepresentation bear a close relationship to the interest protected by § 1692e: intrusion upon seclusion, abuse of process, emotional distress from negligent transmission of misleading information, *see Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1008–09 (11th Cir. 2020) (Martin, J., concurring in part and dissenting in part), or intentionally or recklessly caused emotional distress, *see Pierre v. Midland*

So, in *TransUnion*, the Court did not ask how harmful it was to the plaintiff that a third party would read that he is a potential match to the OFAC list, or what negative consequences actually flowed from it. Instead, it concluded that plaintiffs whose reports were disseminated had "demonstrated concrete reputational harm" even though the plaintiffs made no showing of any tangible harm to their reputation. And in *Susinno*, we found an analog because the plaintiff's right of freedom from invasion of privacy was protected at common law. *Susinno*, 862 F.3d at 351–52. That was enough. We did not look to see whether the defendant's phone call really intruded upon the plaintiff's privacy or how great the intrusion was. The call may have been merely annoying, but that did not concern us. In fact, we specifically rejected the notion that repeated calls "with such persistence and frequency as to amount to . . . hounding," would be necessary. *Susinno*, 862 F.3d at 351 (citation omitted). We focused on the right Congress chose—"it sought to protect the same interests implicated in the traditional common law cause of action"—and found that it was traditionally worthy of protection. *Id*. at 352. And, contrary to the Majority's desire for additional negative consequences or more harm than what a robocall involves, we did not hesitate to find the right worthy of protection notwithstanding that the plaintiff had received *only one robocall*. Congress recognized the harm was worthy of protection, and "*Spokeo* addressed, and approved, such a choice by Congress." *Id*.

In no case relevant to the inquiry at hand has the Supreme Court or our court considered the actual harm or

*Credit Mgmt., Inc.*, 29 F.4th 934, 946–48 (7th Cir. 2022) (Hamilton, J., dissenting).

15

extent of injury. Yet, the Majority wishes to engage with what actually happened to Ms. Huber, what she did, and what happened to every plaintiff in the class. But this is irrelevant to our analysis. Standing in this type of case should be decided as a preliminary matter, and nowhere in the jurisprudence is there any indication that we should consider evidence regarding the actual impact or consequences of the violation on a particular plaintiff.[7]

To ask how harmful it was to the plaintiff to receive this misinformation is to add to the straightforward and objective analog test that applies here. The question the Court asked in *TransUnion* was whether the "harm from a misleading statement of this kind bears a sufficiently close relationship to the harm from a false and defamatory statement." *TransUnion*, 141 S. Ct. at 2209. The answer was "yes." And here, substitute "fraudulent misrepresentation" for "a false and defamatory statement" in the last phrase: does the harm from a misleading statement from a debt collector to a debtor about the amount

---

[7] In explaining the requirement of standing and why courts must ensure that plaintiffs have a personal stake in the litigation, the Majority asks rhetorically: "Why not allow any plaintiff seeking to serve as a private attorney general to enforce the statutory right alongside the Executive Branch?" No doubt this question would help hone the analysis in some cases, but not in this one. There is no dispute that Huber received a misleading collection letter and that she suffered a harm. She is not, thus, acting as a "private attorney general," she is acting on her own behalf to obtain relief for the harm she has suffered. There is no risk in this case that Huber or any member of the putative class are acting as private attorneys general and the reference to this concept does little to advance our understanding of standing in this context.

owed bear a sufficiently close relationship to the harm from a fraudulent misrepresentation? The answer is "yes."[8]

Our precedent has established a specific test for concreteness where Congress has provided a remedy. Using that test, we should conclude that the match to the harm at issue in the tort of fraudulent misrepresentation is more than "sufficiently close," and the relevant interest at stake is for debtors to be protected from misleading information from collection agencies, much the same way as common law sought to protect people from fraudulent misrepresentations. The Majority reached this very conclusion. Standing to pursue the statutory remedy requires nothing more; our precedent says that is enough. To require more in the name of "standing" is unwarranted where Congress has chosen to provide a remedy that meets the test that the Supreme Court established in

---

[8] And even if the impact on the plaintiff were the focus, the Majority overlooks the context of the FDCPA. The entire premise underlying congressional action in this area is the fragile state of debtors preyed upon by collection agencies. In passing the FDCPA, the Senate noted that the "suffering and anguish which [unscrupulous debt collectors] regularly inflict is substantial." S. Rep. No. 95-382, at 2 (1977). While we have concluded that this was not an informational injury as such, can there be any doubt that a misleading statement of the amount owed leading to an inability to pay the amount due is any less harmful than a failure to indicate an amount at all? And just as in the context of the TCPA, we have deferred to Congress's judgment that one robocall is actionable because of the interests at stake, here, too, we need to respect Congress's view that debtors need protection from misleading information of this nature.

*Spokeo* and *TransUnion* and we have followed in *Horizon* and *Sussino*.

The Majority's approach does mischief to the approach that the Supreme Court and our Court have endorsed. Therefore, I must respectfully part ways with the Majority.